## Commonwealth *v.* Gregory, Appellant.

508

Argued April 11, 1938.

Before Keller, P. J., Cunningham, Baldrige, Stadtfeld, Parker and Rhodes, JJ.

*Lemuel B. Schofield,* with him *John Patrick Walsh* and *W. Bradley Ward,* for appellant.

*James W. Tracey, Jr.,* Assistant District Attorney, with him *Charles F. Kelley,* District Attorney, for appellee.

Opinion by Parker, J., September 28, 1938:

Two indictments were found by a grand jury against the defendant, John Lester Gregory, one indictment in two counts charging him with assault and battery and indecent assault upon one Marie Harkins, and the other indictment charging him with practicing medicine and surgery, holding himself forth as such a practitioner, assuming the title of doctor of medicine and

surgery, and assuming to diagnose disease by use of medicine and surgery on the body of Marie Harkins, without a license. The cases came on for trial in a court of quarter sessions before Honorable FRANK SMITH, an able and experienced judge, when the defendant waived jury trial under the provisions of the Act of June 11, 1935, P. L. 319 (19 PS §786), and was tried by the judge without a jury. Defendant was found guilty on both indictments and sentenced.

As the question raised on this appeal is whether the evidence was sufficient to prove beyond a reasonable doubt the offenses charged, it becomes necessary to refer to the evidence in some detail. The defendant is an ordained minister of the Methodist Episcopal Church and a graduate of Drew Theological Seminary with the degrees of Bachelor of Divinity and Doctor of Theology, and at the time of the trial was in charge of a church at Northport, Long Island, New York. Marie A. Harkins, a married woman 28 years of age at the time of trial, lived with her father, mother, and sister on Green Street in Philadelphia. One of her legs had been amputated and she was wearing an artificial leg. On July 13, 1936, the defendant secured a card from the Girard Artificial Limb Company and presented it to Mrs. Harkins' father at his residence where he introduced himself as Doctor Gregory and asked for Mrs. Harkins. At this point we quote from the testimony of Mrs. Harkins: "I told him he would have to wait. Dr. Gregory said that would be all right, he would wait. It was in our private dining room—I came downstairs and we were in our private dining room and I told him to come in—it was a taproom and I could not talk in the public part. Dr. Gregory came back and he sat down and asked was I satisfied with the limb, did it fit and how was I getting along. I said I was satisfied, then he asked me to remove my dress. First I hesitated and he said I didn't have to be ashamed,

he was a doctor. Then when I took off the dress, he asked me would I lift my slip and walk up and down the room to see how it worked—to see how the knee worked, and I did. Then I was going to sit down and he asked me how the belt fitted me, that went around my waist. Then he pulled down my step-ins about three inches, past the hip. Then when I put my hand over the front of me, he said I didn't need to be embarrassed that he was a doctor. Then he asked me to remove the limb. He felt all around the stump of my leg and he said I was quite flabby but in time that would all disappear. Then when I went in the kitchen to put on the limb, he said, 'Just a minute'; then I sat down and we were talking, and then he said he had two young ladies he was interested in, who had their limbs cut off last winter ...... I said, 'Doctor, where is your office?' He said, 'Up the State.' I said, 'Doctor, I had better put the limb on, or it will swell and I cannot get it on.' When I took it off, I didn't have to remove my underwear, but when I put it on, I had to remove part of the step-ins. I said I would put it on in the kitchen and he said, 'That is all right, I will carry the leg out in the kitchen,' which he did. Then afterwards he came in and sat down again, while I put the leg on ...... My mother asked where is his office, so he said New York, or some such thing. Then after he went away I called the limb company up again, and I asked them 'Where do you know Dr. Gregory from?' He said, 'Dr. Gregory just walked in and didn't present any credentials.' Q. Was anyone in the room other than yourself and the defendant? A. My sister. Q. She was there all the time? A. Yes, and when she left the room my mother was in the room ...... Q. You had on a long house dress? A. No, I had on a dress that opened in the front. When I lifted it, he said would I mind removing it. Q. Did not the dress you had on, conceal entirely your limbs? A. Not the

entire limb. Q. In order to see the limb it was necessary to take off the dress? A. No, it was not. Q. Did the doctor tell you to take off the dress? A. Yes, because he was a doctor, and told me not to be embarrassed ...... Q. Then he asked to see the stump of your leg? A. Yes. Q. Did he ask to feel the stump of your leg? A. He felt all around—he didn't ask me to feel it. Q. Do you mean to say he came over and felt it without your permission? A. He was standing beside me. Q. Did he have your permission to feel the stump of your limb? A. No, he didn't ...... Q. Was anything said about surgery? A. I asked did he operate on the girls and he didn't answer me."

Mrs. Harkins' sister or her mother was in the room during the hour and a half that Dr. Gregory was there. Mrs. Helen Allen, a sister of Mrs. Harkins, corroborated her testimony. With reference to the alleged familiarities of the defendant we quote from her testimony as follows: "He asked her could he look at the limb—could he see it. She said, 'Dr. I have a one piece dress on, and—' and she started to unbutton it, and he said, 'No', that she should remove the dress, he wanted to see the limb. Then after that he pulled her step-ins down about three or four inches, and when she put her hand in front of her, he said, 'Don't be embarrassed, I am Dr. Gregory from the Girard Limb Company.' And then he felt all around the stump and he said it was very flabby, but in time it would be all right, and then he told her then about the two girls that were hit by a machine. She asked him if he had operated on them, and he said no. She said, 'Doctor, where is your office?' And he said, to her, it is up the State." There was further corroboration of the testimony by the mother, particularly with reference to his statement that his office was in New York.

Dr. Gregory returned to the Harkins residence two weeks later where he was held in conversation by Mrs.

Harkins, during which time she again inquired with relation to his place of business and received evasive replies. He was detained until police officers or detectives were summoned and the doctor was arrested. One of the detectives testified that he referred to the persons in whom he was interested as patients. It was shown that the defendant was not licensed to practice medicine or surgery.

Dr. Gregory took the stand and it was admitted that he was not a physician or surgeon. He stated that he had been interested for a considerable period in welfare work, especially in securing artificial limbs for children and young people who had lost their limbs. It was also shown that he had been instrumental in procuring artificial limbs in several cases. He testified that he asked Mrs. Harkins' consent to examine the stump of the leg and that she assented to it, but he denied that he pulled down the step-ins as testified by Mrs. Harkins and her sister.

(1) We will first consider the sufficiency of the evidence to sustain the charges of assault and battery and indecent assault. "The least touching of another's person wilfully, or in anger, is a battery": 3 Blackstone's Com. 120. However, it is not every touching or laying on of hands that constitutes an assault and battery; "the touching of, or injury to, another must be done in an angry, revengeful, rude or insolent manner so as to render the act unlawful": 6 C. J. S., Assault and Battery §9. The American Law Institute (Restatement, Torts, §18) defines a battery as follows: "An act which, directly or indirectly, is a legal cause of a contact with another's person or with anything so closely attached thereto that it is customarily regarded as a part thereof and which is offensive to a reasonable sense of personal dignity, although involving no bodily harm, makes the actor liable to the other, if (a) the act is done with the intention of inflicting a harmful

or offensive contact upon the other or a third person or of putting the other or a third person in apprehension thereof, and (b) the contact is not consented to by the other, and (c) the contact is not otherwise privileged."

In *Com. v. DeGrange*, 97 Pa. Superior Ct. 181, 185, Judge CUNNINGHAM, speaking for this court, defined an indecent assault "as the taking by a man of indecent liberties with the person of a female without her consent and against her will, but with no intent to commit the crime of rape." It was further said in that connection that "the technical name by which the offense is designated in or on the indictment is not important. In such cases the fundamental offense against organized society is the assault." It was held in that case that the placing by the defendant of his hands upon the private parts of a girl 8 years of age, although no bodily harm was done, constituted an indecent assault. "Generally, shame or other disagreeable emotion on the part of a female is important in determining whether an aggravated or indecent assault was committed": 4 Am. Jur., Assault and Battery, §27. Also see 27 A. L. R. 859, Note. It is apparent that the offense of indecent assault comprehends an assault and battery. There may be an assault and battery without any distinct physical injury resulting: *Butler v. Stockdale*, 19 Pa. Superior Ct. 98. As indicated by the definition in the Restatement, there is not an assault and battery if the contact is not made with the intention of inflicting a harmful or offensive contact or if it is consented to by the other party. The defense as to this branch of the case is limited to the contentions that the contacts of Dr. Gregory with the body of Mrs. Harkins were not made with a criminal intent and that the contacts were with her consent.

The verdicts were found by a judge who heard and saw the witnesses. The credibility of the witnesses was

for him and he accepted the testimony of Mrs. Harkins and her witnesses and rejected that of Dr. Gregory where there was a conflict with her testimony. Our problem is therefore limited to an examination of the evidence for the purpose of ascertaining whether it was sufficient to support the verdict. The verdict rendered assumes that Dr. Gregory falsely pretended to Mrs. Harkins and the members of her family that he was a doctor of medicine and surgery, that Mrs. Harkins assumed he was such a doctor, and that by fraud he secured a view of her body, practically naked; that Gregory felt the stub of her leg without her permission; that he pulled down her step-ins three inches below her hips; and that when she put her hand in front of her he said that she did not need to be embarrassed as he was a doctor. We quote from the opinion of the court below: "The law has been most zealous in protecting the virtue and chastity of women as against the lust and perversions of evil minded men. A woman's body is inviolate but for those to whom she would knowingly and willingly surrender it. It cannot be conceived that a young woman of good moral repute would expose her naked thighs, hips and body to a complete stranger unless she believed his representations that he was a doctor. Neither can it be assumed that she would permit this man to place his hands on her thigh or to pull down her step-ins over her hips unless she believed his fraudulent misrepresentations to be true."

Even if Dr. Gregory were given the full benefit of his contention, contradicted by Mrs. Harkins, and we assume that she consented to a manual examination of the stub of her leg, that was no justification for the further liberties that he took in exposing her body below the hips. To suggest that this was not done with the intention of inflicting an offensive contact will not stand the light of reason for it is to assume that he did not

intend the known consequences of an act. He claimed at the trial to be a highly educated clergyman which we assume indicated a training and study of moral conduct, yet he took advantage of such permission as he received to study the operation of the artificial leg to expose a part of the body which would be offensive to any woman of the slightest modesty. Mrs. Harkins' testimony indicates that the conduct of the clergyman was offensive to her.

The appellant asks us to assume that this familiarity was all with the consent of Mrs. Harkins and to conclude that it was therefore not assault and battery or indecent assault. We are of the opinion that the evidence warranted a conclusion by the trial court that Dr. Gregory secured such consent as he did in fact obtain to study the mechanics and efficiency of the artificial limb by knowingly and fraudulently leading Mrs. Harkins to believe that he was a doctor of medicine and surgery. Not only was the title of doctor used so as to convey that meaning and that meaning alone, but the defendant did not do—at least he does not say he did—what we would have expected one of his true profession to do. He was an utter stranger to these people and introduced himself to them. The natural introduction for him to have employed would have been to say he was a minister of the gospel if he did not intend to deceive. When Dr. Gregory was questioned by one of the detectives he did not refer to the persons in whom he was interested as parishioners but as "patients." When Dr. Gregory was asked on direct examination as to whether he had said he was interested in two "patients" in New York he replied: "That I do not recall. I don't know if I did or not."

Such being the facts which we must assume the court found, any consent claimed to have been given was obtained by the perpetration of a fraud, was vitiated by such fraud and is not a defense to the charge of assault

and battery or indecent assault. The deceit practiced was a fraud on the will of Mrs. Harkins equivalent to force: *Com. v. Stratton,* 114 Mass. 303. The legal reasoning involved is the same as that followed in the consideration of larceny by trick. "The rule of law is well settled, that if the possession of property is obtained by an artifice, accompanied with the felonious intent on the part of the person obtaining it to convert it to his own use, and if he does so convert it, the offense is larceny": *Com. v. Eichelberger,* 119 Pa. 254, 274, 13 A. 422.

The conclusion at which we have arrived is in harmony with that reached in other states. In the case of *Bartell v. State,* 106 Wis. 342, 345, 82 N. W. 142, the defendant under the pretense of giving a massage treatment to a young woman 18 years of age who was afflicted with a nervous ailment, caused her to expose her body to him and permit him to examine and touch her naked form. In addition he took some further undue liberties with her person. The court there sustained a conviction for indecent assault and in that connection said: "The law relating to physical violations of the persons of females, accomplished by such species of fraud and imposition as may be exercised by a person under the pretence of necessity or authority, where the violator, because of his position, has exceptional opportunities for thus imposing upon his victim, is too well known to need any discussion here." Also see 6 C. J. S., Assault and Battery, §90.

(2) By the Act of June 3, 1911, P. L. 639 (63 PS §401) it is made a misdemeanor for any person not licensed by the Bureau of Medical Education and Licensure, as required by the act, who is not specifically exempted by the act "to engage in the practice of medicine and surgery, or to hold himself or herself forth as a practitioner in medicine and surgery, or to assume the title of doctor of medicine and surgery, or doctor

of any specific disease, or to diagnose diseases, or to treat diseases by the use of medicines and surgery."

What we have heretofore said shows that the evidence was sufficient to support a conclusion by the fact finding authority that the defendant held himself forth as a practitioner in medicine and surgery and assumed the title of doctor of medicine and surgery, when he was not in fact a licensed physician or surgeon. That is precisely what the Act of 1911 proscribes. The earlier Act of 1893 which was superseded and repealed by the Act of 1911 did not specifically make it a misdemeanor to assume the title of doctor of medicine and surgery or to hold oneself forth as a practitioner of such arts. With the evident purpose of promoting the enforcement of the law and to correct evils shown to exist these clauses were added in the later act. The assumption of the title of doctor by this defendant under the circumstances could not import any other meaning than a doctor of medicine and surgery. He approached Mrs. Harkins in a matter that was concerned with medicine and surgery and secured her consent to an examination of the artificial limb because he pretended to be a qualified practitioner. Assuming to act in that capacity, he secured an intimate inspection and examination of her body. Not only was the fact that the defendant was a doctor of theology not any justification for his assuming the role of a doctor of medicine and surgery, but the title was used with the intention of conveying a false impression.

But the appellant contends that the gist of the offense is the practice of medicine and surgery and that since the defendant did not prescribe any medicine or perform any act of surgery his conduct did not make him liable to conviction under the act. We deem this a very narrow view of the purposes of the act. Undoubtedly it is one of the prime purposes of the Act of 1911 to prevent the practice of this profession by those not hav-

ing sound training as a qualification for such practice. But that is not all that may be gathered from the title, the preamble and the context of the act. Because of the extreme intimacy of the relationship between physician and patient, it is of the utmost importance that only those who are competent to practice should be permitted so to do. It is also important that those licensed to practice this profession should have a proper training in the duties and responsibilities of a physician just as they should know anatomy and have studied the functional operation of the human system. The fifth section of the Act of 1911 (63 PS §405) makes it a qualification for licensure that the applicant be a person of good moral character. The license to practice this profession is intended to be a badge that carries with it privileges the proper exercise of which are of great concern to the community. Because the defendant pretended to be a doctor, he secured a view of and contact with the body of Mrs. Harkins in a matter closely related to the practice of the profession with which we are concerned. The facts proved brought him within the terms of the Act of 1911.

The judgment in each appeal is affirmed.