M. Marvin Berger, J.
Advocating homosexuality is not a crime.
Regardless of one’s view of homosexuality, its apologists are free to speak or write in defense of their views, under the protection of the First Amendment to the Constitution of the United States — unless, of course, the expression of those views violates the law.
The issue in this case is whether the defendants, who gained access to the Columbia Broadcasting System (hereinafter referred to as C. B. S.) television studios on West 57th Street, by deception, or, as they prefer to state it, by “ a clever subterfuge or ruse,” violated section 140.10 of the Penal Law of this State, which forbids knowing entry upon, or remaining unlawfully in, a building, or on real property fenced or enclosed to exclude intruders. Following their admission into the studio building, one of the defendants, Segal, entered another area of the building, from which a live news program was being televised, and ¡showed his displeasure with C. B. S.’s attitude toward homosexuals by shouting and displaying in front of a TV camera a hand-lettered placard which he had brought into the studio. Meanwhile, the codefendant, Langhorne, photographed the happening.
What the prosecution terms a trespass is described in one of the defense briefs as intended to 1 ‘ raise the consciousness of the unconscious news media over slights, slurs, slanders, and stupidity involving the reporting and nonreporting of events concerning homosexuals and the gay community.”
The facts are largely undisputed. Segal telephoned George Hoover, director of community relations for C. B. S., said he was Mark Ursa, a student of journalism at a community college in New Jersey, and requested permission to witness a live TV news broadcast by Walter Cronkite, one of the system’s principal newscasters, and, if possible, to interview Cronkite after completion of the program.
Hoover agreed to the proposal, and some days later Segal arrived at the C. B. S. studios, where he was met by Hoover’s assistant, Ann Morfogen, Segal identified himself as Mark Ursa, and introduced Langhorne as Harry Lang, a fellow student. Ms. Morfogen noted that Langhorne carried a camera and warned him not to take pictures during the broadcast, but said he might do so after the broadcast.
Ms. Morfogen then escorted Segal and Langhorne past a uniformed guard and through doors, which bore notices to the *946 effect that access was restricted to C. B. S. employees and other authorized persons, to the news studio.
Witnesses described the news studio as a large room, part of it railed off by a waist-high partition. Inside the rail were Cronkite’s desk and TV cameras. Behind the rail sat secretaries and other studio employees. There were openings in the partition through which TV cameras and studio employees • could gain access to the inner area.
Sometime during the latter half of the half-hour program, Segal ran through one of the rail openings and held up a sign in front of a camera trained on Cronkite. The sign read ‘1 Gays Protest CBS prejudice ”. Segal shouted a few words to the same effect, while Langhorne took photographs.
Studio employees fell upon Segal, wrested Langhorne’s camera from his grasp, either removed or exposed the film, and took defendants to the C. B. S. security office. There, they were interviewed by Chris Borgen, a C. B. S. news reporter. The interview was incorporated in the regular news broadcast televised by Channel 2, the local C. B. S. station.
A tape of the happening introduced into evidence, corresponding to the recollection of the People’s witnesses, showed Cronkite’s usual imperturbability ito have been unaffected by the incident. Cronkite testified, however, that the broadcast had been interrupted and that normal studio routine had been disturbed.
The defendants testified that they had been demonstrating for some time before the incident in question, in order to establish the rights of homosexuals to live, work and enjoy the same protection of the law as other citizens. They had made similar unscheduled appearances on other live TV broadcasts without suffering consequences more serious than expulsion from the studios they invaded. It was explained that Segal demonstrated on live, rather than on taped, programs, since the live programs could not be edited to delete Segal’s message.
Research by court and counsel has failed to disclose a case in point. However, a number of reported cases relating to burglary have served to guide the court in reaching its verdict.
Defendants claim that it would be a travesty of justice to convict them of criminal conduct ‘ ‘ for what was ostensibly a civil rights demonstration under a statute which comports more with burglary than with disorderly conduct ”, although they assert that they did not commit the latter offense.
Criminal trespass and burglary are described in article 140 of the Penal Law entitled “Burglary and Related Offenses.” *947 However, along with article 145, “ Criminal Mischief and Related Offenses ’ ’ and article 150, ‘ ‘ Arson ’ ’, it appears under title I, headed ‘ ‘ Offenses Involving Damage to and Intrusion Upon Property
The defendants’ view of their conduct as a constitutionally protected exercise of free speech, a civil rights demonstration, flies in the face of the majority holding in Adderley v. Florida (385 U. S. 39). In that case, defendants claimed the right to demonstrate in behalf of civil rights on restricted jail property, because the area was particularly appropriate for that purpose. The Supreme Court view expressed by Mr. Justice Black rejected this reasoning in the following language (p. 47): “ Such an argument has as its major unarticulated premise the assumption that people who want to propagandize protests or views have constitutional right to do so whenever and however and wherever they please. That concept of constitutional law was vigorously and forthrightly rejected in two of the cases petitioners rely on, Cox v. Louisiana, supra [379 U. S. 536], at 554-555 and 563-564. We reject it again.”
And in Food Employees v. Logan Plaza (391 U. S. 308), the majority opinion, sustaining the appellants’ right to picket a business enterprise located within a shopping plaza, stated (p. 320): “ where property is not ordinarily open to the public, this Court has held that access to it for the purpose of exercising First Amendment rights may be denied altogether.”
The chief defense argument asserts that the People must allege and prove criminal intent to bring about conviction of the defendants.
The People agree. It would be difficult to do otherwise in the face of the language of section 140.10 which requires that the defendants must knowingly enter or remain unlawfully on real property designed to exclude intruders. Furthermore, section 15.10 of the Penal Law, delineating “ strict liability ” offenses, defines an offense as one of mental culpability if a culpable mental state on the part of the actor is required with respect to every material element of an offense.
Thus, the issue is narrowed down to the critical question— was the defendants’ entry on C. B. S. property an act performed knowingly?
Section 140.10 requires that the unlawful entry into or remaining in the building must be performed knowingly. The term “ knowingly ” is defined in subdivision 2 of section 15.05 of the Penal Law in the following language: “ A person acts knowingly with respect to conduct or to a circumstance described *948 by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists.” As noted by the authors of the Practice Commentary (McKinney’s Cons. Laws of N. Y., Book 39, Penal Law, § 15.05, p. 22), the definition is largely self-explanatory.
But defendants assert that despite their gaining admission to the premises by deception, they could feel they were on C. B. S. property legally. Mot only were they never told to leave the C. B. S. building, but they were interviewed, by Borgen and the interview was broadcast during the 11 .-06' p.m. news program that night, thus conferring a pecuniary benefit on C. B. S.
Preliminarily, there' seems to be no question but that the C. B. S. building is not open to the public. Despite the fact that the network, the’ stations it owns, and independently owned stations contracting with it for program services operate under licenses granted and terminable by the Federal Communications Commission, under Federal law, the C. B. S. studios are private property.
Subdivision 5 of section 140.00 of the Penal Law defines the term “ enters or remains unlawfully in or upon premises ” as used in section 140.10 of the Penal Law, which the defendants are accused of violating, by stating: “A person ‘ enters or remains unlawfully ’ in or upon premises when he is not licensed or privileged to do so.”
The authors of the Practice Commentary, Richard G. Denzer and Peter McQuillan, note (McKinney’s Cons. Laws of M. Y., Book 39, Penal Law, § 140.10, p. 341): “ Of course, a person who gains admittance to premises through intimidation or by deception, trick or artifice, does not enter with ‘ license or privilege ’.”
Defendants minimize the importance of the commentary by noting, quite accurately, that no authority is cited for that proposition, and thus it is “ hardly precedent under our system of jurisprudence.”
If, at the time the note was written, the distinguished authors of the commentary had achieved their present status of Judge of the Court of Claims and Acting Supreme Court Justice, respectively, their comment, if embodied in an opinion, would likewise not be binding on this court.
But common sense suggests that a respected text writer or teacher, despite the nonauthoritative status of-his writing, may persuade a Judge of the validity of his thinking. In People v. Licata (28 N Y 2d 113, 117) the court’s unanimous opinion, written by Judge Jasen, quotes only the Practice Commentary *949 to the Penal Law relating to section 140.00 (pp. 341-342) to explain the meaning of “ remain ” as used in the phrase “ enter or remain ” in section 140.05 of the Penal Law.
For that matter, the defendants quote the Practice Commentary when it supports their argument.
Under some circumstances, a person has the right to assume that he is licensed or privileged to enter or remain upon premises unless and until the withdrawal of that permission is brought to his attention. Thus, the second and third sentences of subdivision 5 of section 140.00, defining “ enter or remain unlawfully”, permit a person to enter or remain on premises open to the public, unless he defies a lawful order not to enter or remain, personally communicated to him by the owner or other authorized person. And a person’s license or permission to enter or remain in a building only partly open to the public does not validate entry into or remaining upon the nonpublic portion of the building.
The definition implies that where permission to enter or remain on nonpublic premises is based on the entrant’s fraud or misrepresentation, the license is inoperative.
In chapter 13 of the Restatement of Torts 2d (§ 330, p. 175), it is said: “ One who obtains the consent of an owner, either by way of invitation or permission, by a conscious misrepresentation of any fact upon which he knows that the consent is conditioned, as the identity of the entrant or the purpose of the entry, is not a licensee.” The Restatement (ch. 8, § 173, p. 317) clarifies the meaning of misrepresentation of material facts in the following language: “ A misrepresentation as to the identity, calling, character, or some other quality of the actor may be a misrepresentation as to a material fact.” And the Restatement continues (p. 318): “A conscious misrepresentation as to the purpose for which admittance to the land is sought, may be a fraudulent misrepresentation of a material fact.”
In Corpus Juris Secundum (vol. 87, Trespass, § 158, p. 1111), it is stated: “ A license, express or implied, is a good defense to the licensee for acts within its scope in prosecutions for criminal trespass. A license is a good defense, but not to persons other than the licensee, or for acts not within the scope of the license or acts done after it has been revoked.”
An annotation to the case of Smith v. State of Alaska (362 P. 2d 1071, 93 ALR 2d 525), deals with the maintainability of burglary charges where entry into a building is made with consent, and states (pp. 537, 538): “ a consent limited as to place, time or purpose is not a defense where entry occurs outside the *950 limitation .stated or implied * * * Also, where the implied consent to enter is limited to a specific purpose, entry for a different purpose is outside the consent.”
In the instant case, it is inconceivable that C. B. S. would license the defendants to enter its studio to demonstrate on the air their resentment of 0. B. S.’s hostile attitude towards homosexuals in its broadcasts. In fact, Segal, in his testimony, justified the assuming of an alias, in seeking admission to the building, by concern that C. B. S. personnel might recognize his real name and his history as a demonstrator on other television programs.
The People, in the opinion of this court, have established beyond reasonable doubt that the defendants knowingly entered into or remained without license or privilege upon the C. B. S. premises.
Assuming, arguendo, that the defendants’ initial presence in the building was licensed or privileged, their subsequent intrusion on the Cronkite set was a criminal trespass.
The defendants maintain that the statute requires criminal intent and reasonable notice to persons who would be chargeable with criminal trespass.
But, according to section 140.00, notice not to enter or remain must be personally communicated only where premises are open to the public.
In McGloin v. United States (232 A. 2d 90 [D. C. Ct. App.]), defendant’s conviction of unlawfully entering a four-unit apartment building, based on his being found first on a fire escape and then on a stairway near the roof, was sustained. The appellant argued that since he was not warned verbally or by sign to refrain from entering the premises, he did not violate the District of Columbia Code.
Appellant cited Bowman v. United States (212 A. 2d 610, 611 [D. C. Ct. App.]), which dealt with the same statute and spoke of the need to notify the intruder verbally or by sign to keep off.
The Court of Appeals analyzed its holding in the Bowman case in the following language (p. 91): “ Bowman must be read in the light of the facts of that case. It concerned an unlawful entry into a restricted area of the Union Station, a semi-public building. In such a building the public generally is permitted to enter and if there are portions which are not obviously private or restricted, it is only reasonable that warning of some kind be given to the public to stay out. Even in a semi-public or public building there are portions obviously not open to the *951 public; and surely no one would contend that one may lawfully enter a private dwelling house simply because there is no sign or warning forbidding entry.”
The sanctuary of a church is not marked with signs restricting entrance to clergy, nor is it necessary for the pastor to warn the worshippers that they are not to cross the altar rail. The stage manager does not mount the stage to announce that only actors or stagehands are permitted beyond the proscenium arch.
In People v. Rewald (65 Misc 2d 453) defendant, a newspaper reporter, appealed from his conviction in a Court of Special Sessions, of violation of section 140.05, criminal trespass in the third degree, because of his refusal to leave a migrant labor camp at the direction of the camp manager. Although the charge dealt with remaining on the premises, and defendant’s conviction was reversed, the opinion of Judge Lyman H. Smith is instructive. It reads, in part, as follows (pp. 456, 457) :
“ Clearly this provision [Penal Law, § 140.00, subd. 5] permits entry upon premises ‘ open to the public ’ in the absence of a specific prohibition. Query then, when are premises ‘ open to the public ’, and when, and under what circumstances, may the right to remain be revoked?
‘ ‘ That the Kings Perry migrant labor camp was 1 open to the public ’ seems clear from the present record. The fact that its residents move freely in and out of the area dictates a finding that they, too, are part of the public. So, too, are all those who come and go for various social and business reasons, including the defendant-appellant. We turn then to a consideration of the rights of the owner or possessor of such premises.
“ This court is compelled to conclude that mere title or possessory control of premises cannot be determinative of the issues met here. In those cases revealing a public or quasi-public use of premises a determination of the right to impose the penal sanction against trespass must depend upon the degree of public use which the owner permits or invites upon his premises. Public or partial public use of premises, whether under express or implied invitation or permission, carries with it the license to enter and, absent abuse of such privilege, carries with it the correlative license to lawfully remain. In cases such as this, the owner’s or possessor’s revocation of the right to remain (by denial, request or by order to leave), which will convert the status of the alleged offender from licensee to that of criminal trespasser, must rest upon, and arise from, either reasonable customs and practices, rules, regulations, and/or statutory law, *952 or under circumstances from which a reasonable ownér and possessor would anticipate clear and present danger to person, property or the public peace.” (Emphasis supplied.)
(See People v. Arvio, 66 Misc 2d 474; People v. Licata, 28 N Y 2d 113, supra.)
The cases cited by defendants as authority for the proposition that knowledge of unlawful entry or remaining in a building is essential for conviction are not apposite.
People v. Martinez (43 Misc 2d 94), deals with remaining unlawfully, which is not relevant to the facts in this ease. People v. Lawson (44 Misc 2d 578, affd. 16 N Y 2d 552) interpreted section 2036 of the old Penal Law which did not make criminal refusal to leave premises lawfully entered, but covered only unauthorized entry upon real property and which has since been superseded.
The defendants assert that they acted without criminal intent, for “ no reasonable person would, under the circumstances, expect that he or she would subject themselves to like charges.”
That argument is not persuasive. It assumes that the defendants’ reason overrode their passion to arouse persons listening to the Cronkite broadcast to C. B. S.’s prejudices against homosexuals and that they never expected to be arrested.
Second, the defendants claim that after their ejection from the news studio, they were never ordered to leave the building, but were in fact detained and then interviewed by Channel 2 newsmen. If that argument is intended to demonstrate that C. B. S. had not withdrawn its permission to the defendants to enter or remain on its premises, it also fails in that objective, in view of the fact that the entry was procured by fraud.
Defendant Segal asserts that he had engaged in similar demonstrations on N. B. C. network shows without having been directed or charged with a crime. In the court’s view, that argument merely indicates that N. B. C. may have been more permissive in its attitude to uninvited guests intruding upon its programs and less inclined to pursue the often troublesome task of helping to prosecute persons violating the law than C. B. S.
Finally, say the defendants in their memorandum of law, following the trial, C. B. S.-TV has broadcast more news and feature programs of interest to homosexuals and thus effected changes “ directly attributable to the efforts of the defendants ” — their past entreaties to C. B. S. to engage in such programming and news coverage having been previously ignored.
That argument bears a strong resemblance to one asserting that the end justifies the means.
*953 The defendants impressed the court as intelligent young men, dedicated to their beliefs that society’s hostility to the rights of homosexuals required correction, and that they were warranted in using spectacular means ‘ ‘ to establish dignity and freedom for America’s largest oppressed minority.”
Without expressing an opinion as to the basis for the defendants’ outrage at the treatment of homosexuals by the community, the court cannot condone the means employed by the defendants to seek redress.
The law does not excuse criminal conduct by a person who mistakenly believes that he is not committing an offense — unless that belief is based on an official statement of the law emanating from specific governmental sources (Penal Law, § 15.20, subd. 2).
The defendants have failed to convince the court that they acted in good faith, in an honest but mistaken belief that they were privileged to enter the C. B. S. premises for a demonstration.
People v. Stevens (109 N. Y. 159,163-164) speaks to this point in the following language: “ to constitute a trespass on land, an indictable offense, the distinguishing feature is an unlawful and criminal intent * * * there was no colorable ground for any claim, on the part of the defendant, that he had any right or authority to enter upon the premises, arising out of the facts existing at the time.”
The defendants stand convicted as charged.