44 F.3d 1345
 23 Media L. Rep. 1161
 J.H. DESNICK, M.D., Eye Services, Limited; Mark A. Glazer;
and George V. Simon, Plaintiffs-Appellants,
v.
AMERICAN BROADCASTING COMPANIES, INCORPORATED; Jon Entine;
and Sam Donaldson, Defendants-Appellees.
 No. 94-2399.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 1, 1994.
Decided Jan. 10, 1995.
 
 Dan K. Webb, Julie A. Bauer, Steven F. Molo (argued), Winston & Strawn, Chicago, IL, Rodney F. Page, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC, for plaintiffs-appellants.
 Michael M. Conway (argued), Mary Kay McCalla, James M. Falvey, Hopkins & Sutter, Chicago, IL, for defendants-appellees.
 Before POSNER, Chief Judge, and COFFEY and MANION, Circuit Judges.
 POSNER, Chief Judge.
 
 
 1
 The plaintiffs--an ophthalmic clinic known as the "Desnick Eye Center" after its owner, Dr. Desnick, and two ophthalmic surgeons employed by the clinic, Glazer and Simon--appeal from the dismissal of their suit against the ABC television network, a producer of the ABC program PrimeTime Live named Entine, and the program's star reporter, Donaldson. The suit is for trespass, defamation, and other torts arising out of the production and broadcast of a program segment of PrimeTime Live that was highly critical of the Desnick Eye Center. Federal jurisdiction is based primarily on diversity of citizenship (though there is one federal claim), with Illinois law, and to a lesser extent Wisconsin and Indiana law, supplying the substantive rules on which decision is to be based. The suit was dismissed for failure to state a claim. See Desnick v. Capital Cities/ABC, Inc., 851 F.Supp. 303 (N.D.Ill.1994). The record before us is limited to the complaint and to a transcript, admitted to be accurate, of the complained-about segment.
 
 
 2
 In March of 1993 Entine telephoned Dr. Desnick and told him that PrimeTime Live wanted to do a broadcast segment on large cataract practices. The Desnick Eye Center has 25 offices in four midwestern states and performs more than 10,000 cataract operations a year, mostly on elderly persons whose cataract surgery is paid for by Medicare. The complaint alleges--and in the posture of the case we must take the allegations to be true, though of course they may not be--that Entine told Desnick that the segment would not be about just one cataract practice, that it would not involve "ambush" interviews or "undercover" surveillance, and that it would be "fair and balanced." Thus reassured, Desnick permitted an ABC crew to videotape the Desnick Eye Center's main premises in Chicago, to film a cataract operation "live," and to interview doctors, technicians, and patients. Desnick also gave Entine a videotape explaining the Desnick Eye Center's services.
 
 
 3
 Unbeknownst to Desnick, Entine had dispatched persons equipped with concealed cameras to offices of the Desnick Eye Center in Wisconsin and Indiana. Posing as patients, these persons--seven in all--requested eye examinations. Plaintiffs Glazer and Simon are among the employees of the Desnick Eye Center who were secretly videotaped examining these "test patients."
 
 
 4
 The program aired on June 10. Donaldson introduces the segment by saying, "We begin tonight with the story of a so-called 'big cutter,' Dr. James Desnick.... [I]n our undercover investigation of the big cutter you'll meet tonight, we turned up evidence that he may also be a big charger, doing unnecessary cataract surgery for the money." Brief interviews with four patients of the Desnick Eye Center follow. One of the patients is satisfied ("I was blessed"); the other three are not--one of them says, "If you got three eyes, he'll get three eyes." Donaldson then reports on the experiences of the seven test patients. The two who were under 65 and thus not eligible for Medicare reimbursement were told they didn't need cataract surgery. Four of the other five were told they did. Glazer and Simon are shown recommending cataract surgery to them. Donaldson tells the viewer that PrimeTime Live has hired a professor of ophthalmology to examine the test patients who had been told they needed cataract surgery, and the professor tells the viewer that they didn't need it--with regard to one he says, "I think it would be near malpractice to do surgery on him." Later in the segment he denies that this could just be an honest difference of opinion between professionals.
 
 
 5
 An ophthalmic surgeon is interviewed who had turned down a job at the Desnick Eye Center because he would not have been "able to screen who I was going to operate on." He claims to have been told by one of the doctors at the Center (not Glazer or Simon) that "as soon as I reject them [i.e., turn down a patient for cataract surgery], they're going in the next room to get surgery." A former marketing executive for the Center says Desnick took advantage of "people who had Alzheimer's, people who did not know what planet they were on, people whose quality of life wouldn't change one iota by having cataract surgery done." Two patients are interviewed who report miserable experiences with the Center--one claiming that the doctors there had failed to spot an easily visible melanoma, another that as a result of unnecessary cataract surgery her "eye ruptured," producing "running pus." A former employee tells the viewer that Dr. Desnick alters patients' medical records to show they need cataract surgery--for example, changing the record of one patient's vision test from 20/30 to 20/80--and that he instructs all members of his staff to use pens of the same color in order to facilitate the alteration of patients' records.
 
 
 6
 One symptom of cataracts is that lights of normal brightness produce glare. Glazer is shown telling a patient, "You know, you're getting glare. I would say we could do significantly better [with an operation]." And Simon is shown asking two patients, "Do you ever notice any glare or blurriness when you're driving, or difficulty with the signs?" Both say no, and immediately Donaldson tells the viewer that "the Desnick Center uses a very interesting machine, called an auto-refractor, to determine whether there are glare problems." Donaldson demonstrates the machine, then says that "Paddy Kalish is an optometrist who says that when he worked at the Desnick clinic from 1987 to 1990, the machine was regularly rigged. He says he watched a technician tamper with the machine, this way"--and then Kalish gives a demonstration, adding, "This happened routinely for all the older patients that came in for the eye exams." Donaldson reveals that Dr. Desnick has obtained a judgment against Kalish for defamation, but adds that "Kalish is not the only one to tell us the machine may have been rigged. PrimeTime talked to four other former Desnick employees who say almost everyone failed the glare test."
 
 
 7
 There is more, including mention of a proceeding begun by the Illinois Medical Board in which Dr. Desnick is charged with a number of counts of malpractice and deception--and an "ambush" interview. Donaldson accosts Desnick at O'Hare Airport and cries, "Is it true, Doctor, that you changed medical records to show less vision than your patients actually have? We've been told, Doctor, that you've changed the glare machine so we have a different reading. Is that correct? Doctor, why won't you respond to the questions?"
 
 
 8
 The plaintiffs' claims fall into two distinct classes. The first arises from the broadcast itself, the second from the means by which ABC and Entine obtained the information that they used in the broadcast. The first is a class of one. The broadcast is alleged to have defamed the three plaintiffs by charging that the glare machine is tampered with. No other aspect of the broadcast is claimed to be tortious. The defendants used excerpts from the Desnick videotape in the broadcast, and the plaintiffs say that this was done without Dr. Desnick's permission. But they do not claim that in showing the videotape without authorization the defendants infringed copyright, cast the plaintiffs in a false light, or otherwise invaded a right, although they do claim that the defendants had obtained the videotape fraudulently (a claim in the second class). And they do not claim that any of the other charges in the broadcast that are critical of them, such as that they perform unnecessary surgery or that Dr. Desnick tampers with patients' medical records, are false.
 
 
 9
 We begin with the charge of defamation, which the parties agree is governed by Illinois law. The district judge ruled that Glazer and Simon could not establish defamation concerning the tampering with the glare machine because the viewer would not think that they were being accused of doing the tampering. Courts used to strain to find that a defamatory statement that did not actually name the plaintiff might reasonably be understood to be about someone else; this was the "innocent construction" rule. John v. Tribune Co., 24 Ill.2d 437, 181 N.E.2d 105, 108 (1962). But in modern law it is enough if the audience would be likely to think that the defendant was talking about the plaintiff. Chapski v. Copley Press, 92 Ill.2d 344, 65 Ill.Dec. 884, 442 N.E.2d 195 (1982); Haynes v. Alfred A. Knopf, Inc., 8 F.3d 1222, 1226 (7th Cir.1993) (applying Illinois law).
 
 
 10
 Whether it would think that or not is treated by the Illinois courts as a question of law, to be decided by the judge subject to plenary appellate review. Chapski v. Copley Press, supra, 65 Ill.Dec. at 888, 442 N.E.2d at 199. We have done the same in diversity cases in which Illinois law supplies the rule of decision, Babb v. Minder, 806 F.2d 749, 757 and n. 3 (7th Cir.1986); Action Repair, Inc. v. American Broadcasting Cos., 776 F.2d 143, 145 (7th Cir.1985), but without remarking that this question--whether application of the innocent construction rule is a question of fact or of law, and the scope of appellate review--is one of federal, not of state, law. For it is a question about the control of the jury and the relation of the appellate to the trial court, rather than about the substantive law of defamation. See Mayer v. Gary Partners & Co., 29 F.3d 330 (7th Cir.1994); Coplay Cement Co. v. Willis & Paul Group, 983 F.2d 1435, 1438 (7th Cir.1993). But as no party in the present case has questioned the propriety of plenary review, we shall leave the question whether the federal rule should be identical to Illinois's rule for another day.
 
 
 11
 The part of the broadcast about the tampering with the glare machine follows immediately upon Dr. Simon's asking test patients about glare; and earlier Dr. Glazer had been shown asking the same thing of another test patient. The inference that Glazer and Simon are mixed up in the tampering is not inevitable, but it is sufficiently probable to entitle them to sue. Rosner v. Field Enterprises, Inc., 205 Ill.App.3d 769, 151 Ill.Dec. 154, 176, 564 N.E.2d 131, 153 (1990). Kalish tells the viewer that the glare machine is tampered with in all cases involving elderly patients, and hence by implication in cases handled by Drs. Glazer and Simon. And elsewhere the broadcast segment has insinuated that any doctor who works for the Desnick Eye Center is unethical. It is true that Kalish says that technicians do the tampering. But presumably they do so under a doctor's direction. Most viewers would infer that Glazer and Simon, if they did not actually change the setting on the machine themselves, were complicit with the actual tamperer. And even if this were wrong, it would not justify dismissal of the defamation count with respect to the other plaintiff, the Desnick Eye Center itself.
 
 
 12
 The judge also ruled, however, that the defamation count failed because the allegation that the plaintiffs tampered with the glare machine did not significantly increase the damage to their reputations inflicted by the parts of the broadcast segment they do not challenge. If a false accusation cannot do any incremental harm to the plaintiff's deserved reputation because the truth if known would have demolished his reputation already, he has not been harmed by the false accusation and therefore has no remedy. Haynes v. Alfred A. Knopf, Inc., supra, 8 F.3d at 1227-29. This is provided, however, that the false accusation is closely related to the true facts. A sexual deviant might have a worse reputation than an embezzler, but it would not be a defense to a charge of falsely accusing a person of being an embezzler that while he is not an embezzler, he is a sexual deviant, and that is worse. Such a rule "would strip people who had done bad things of any legal protection against being defamed; they would be defamation outlaws." Id. at 1228; see also Liberty Lobby, Inc. v. Anderson, 746 F.2d 1563, 1568 and n. 6 (D.C.Cir.1984), vacated on other grounds, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
 
 
 13
 The doctrine that we have been describing goes by the name of "substantial truth." Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 516-17, 111 S.Ct. 2419, 2432-33, 115 L.Ed.2d 447 (1991); Lemons v. Chronicle Publishing Co., 253 Ill.App.3d 888, 192 Ill.Dec. 634, 636, 625 N.E.2d 789, 791 (1993); Moldea v. New York Times Co., 15 F.3d 1137, 1150, modified on other grounds, 22 F.3d 310, 313 (D.C.Cir.1994). Here is an example from Haynes. The defendants' book said that Haynes had lost a job or jobs because of drinking. What was true was that, during a period in which he was indeed drinking heavily, he lost his job because his supervisor found an unopened bottle of liquor (which Haynes had received from a friend) in his pocket. Moreover, the author had left out of the book a number of very damaging facts about Haynes that later emerged in pretrial discovery, including the fact that he had been arrested and jailed for assaulting a police officer after drinking. Everything considered, the literal truth about Haynes's drinking was neither materially different from, nor significantly less damning than, the falsehood.
 
 
 14
 Haynes had been decided on summary judgment, after the defendants had obtained the complete facts about Mr. Haynes in discovery. We said that the question whether a defamatory work is substantially true although erroneous in some details is ordinarily a jury question but that given the facts that had emerged in discovery no reasonable jury could find a significant incremental harm. 8 F.3d at 1228. In this case there has been no discovery, so dismissal was justified only if it is clear from the transcript of the broadcast segment itself that the plaintiffs could not have been harmed by the charge that they tampered with the glare machine. This may seem clear because they do not challenge the other charges in the broadcast--such as that the Desnick Eye Center performs unnecessary surgery, sometimes with harmful results, that it preys on ignorant old people, and that Dr. Desnick alters patients' records to show a need for cataract surgery where there is none. These are serious charges, but unlike the situation in the Haynes case they neither are admitted nor are established by uncontested affidavits or other undisputed or indisputable evidence. Given the obstacles to proving defamation, the failure to mount a legal challenge to a defamatory statement cannot be considered an admission that the statement is true.
 
 
 15
 And even if all these other charges had been admitted or demonstrated to be true, we could not say on this bare record that the charge of rigging the glare machine adds nothing to them. The other charges, even the alteration of patients' records, either fall into a gray area where disagreement merges with misconduct and disappointment in results with charges of malpractice, or are easily explained away without having to be denied--Desnick claimed merely to be correcting erroneous entries in patients' records made by his technicians. There can be no explaining away the alteration of the settings on an ophthalmic machine so that a person with normal eyesight (Donaldson, who demonstrated the effect of the tampering with the machine on himself) experiences the symptoms of cataract. It is a particularly shocking charge to make against a clinic and its physicians. It would be one thing to accuse a radiologist of misreading x-rays, and another to accuse him of altering his x-ray machine so that a normal person was shown with a tumor on his lung.
 
 
 16
 Of course, when additional facts about the Desnick Eye Center are brought to light in discovery, it may turn out either that the machine was indeed tampered with or that, even if it was not, the plaintiffs did so many other bad things in the line of Medicare fraud that the tampering fades into insignificance. But this is not so clear at this stage that the defamation count of the complaint can properly be dismissed.
 
 
 17
 The second class of claims in this case concerns, as we said, the methods that the defendants used to create the broadcast segment. There are four such claims: that the defendants committed a trespass in insinuating the test patients into the Wisconsin and Indiana offices of the Desnick Eye Center, that they invaded the right of privacy of the Center and its doctors at those offices (specifically Glazer and Simon), that they violated federal and state statutes regulating electronic surveillance, and that they committed fraud by gaining access to the Chicago office by means of a false promise that they would present a "fair and balanced" picture of the Center's operations and would not use "ambush" interviews or undercover surveillance.
 
 
 18
 To enter upon another's land without consent is a trespass. The force of this rule has, it is true, been diluted somewhat by concepts of privilege and of implied consent. But there is no journalists' privilege to trespass. Prahl v. Brosamle, 98 Wis.2d 130, 295 N.W.2d 768, 780-81 (App.1980); Le Mistral, Inc. v. Columbia Broadcasting System, 61 A.D.2d 491, 402 N.Y.S.2d 815 (1978). And there can be no implied consent in any nonfictitious sense of the term when express consent is procured by a misrepresentation or a misleading omission. The Desnick Eye Center would not have agreed to the entry of the test patients into its offices had it known they wanted eye examinations only in order to gather material for a television expose of the Center and that they were going to make secret videotapes of the examinations. Yet some cases, illustrated by Martin v. Fidelity & Casualty Co., 421 So.2d 109, 111 (Ala.1982), deem consent effective even though it was procured by fraud. There must be something to this surprising result. Without it a restaurant critic could not conceal his identity when he ordered a meal, or a browser pretend to be interested in merchandise that he could not afford to buy. Dinner guests would be trespassers if they were false friends who never would have been invited had the host known their true character, and a consumer who in an effort to bargain down an automobile dealer falsely claimed to be able to buy the same car elsewhere at a lower price would be a trespasser in the dealer's showroom. Some of these might be classified as privileged trespasses, designed to promote competition. Others might be thought justified by some kind of implied consent--the restaurant critic for example might point by way of analogy to the use of the "fair use" defense by book reviewers charged with copyright infringement and argue that the restaurant industry as a whole would be injured if restaurants could exclude critics. But most such efforts at rationalization would be little better than evasions. The fact is that consent to an entry is often given legal effect even though the entrant has intentions that if known to the owner of the property would cause him for perfectly understandable and generally ethical or at least lawful reasons to revoke his consent.
 
 
 19
 The law's willingness to give effect to consent procured by fraud is not limited to the tort of trespass. The Restatement gives the example of a man who obtains consent to sexual intercourse by promising a woman $100, yet (unbeknownst to her, of course) he pays her with a counterfeit bill and intended to do so from the start. The man is not guilty of battery, even though unconsented-to sexual intercourse is a battery. Restatement (Second) of Torts Sec. 892B, illustration 9, pp. 373-74 (1979). Yet we know that to conceal the fact that one has a venereal disease transforms "consensual" intercourse into battery. Crowell v. Crowell, 180 N.C. 516, 105 S.E. 206 (1920). Seduction, standardly effected by false promises of love, is not rape, Pletnikoff v. State, 719 P.2d 1039, 1043 (Alaska App.1986); intercourse under the pretense of rendering medical or psychiatric treatment is, at least in most states. Compare State v. Tizard, 1994 WL 630498, * 8-10 (Tenn.Crim.App. Nov. 10, 1994), with Boro v. Superior Court, 163 Cal.App.3d 1224, 210 Cal.Rptr. 122 (1985). It certainly is battery. Bowman v. Home Life Ins. Co., 243 F.2d 331 (3d Cir.1957); Commonwealth v. Gregory, 132 Pa.Super. 507, 1 A.2d 501 (1938). Trespass presents close parallels. If a homeowner opens his door to a purported meter reader who is in fact nothing of the sort--just a busybody curious about the interior of the home--the homeowner's consent to his entry is not a defense to a suit for trespass. See State v. Donahue, 93 Or.App. 341, 762 P.2d 1022, 1025 (1988); Bouillon v. Laclede Gaslight Co., 148 Mo.App. 462, 129 S.W. 401, 402 (1910). And likewise if a competitor gained entry to a business firm's premises posing as a customer but in fact hoping to steal the firm's trade secrets. Rockwell Graphic Systems, Inc. v. DEV Industries, Inc., 925 F.2d 174, 178 (7th Cir.1991); E.I. duPont deNemours & Co. v. Christopher, 431 F.2d 1012, 1014 (5th Cir.1970).
 
 
 20
 How to distinguish the two classes of case--the seducer from the medical impersonator, the restaurant critic from the meter-reader impersonator? The answer can have nothing to do with fraud; there is fraud in all the cases. It has to do with the interest that the torts in question, battery and trespass, protect. The one protects the inviolability of the person, the other the inviolability of the person's property. The woman who is seduced wants to have sex with her seducer, and the restaurant owner wants to have customers. The woman who is victimized by the medical impersonator has no desire to have sex with her doctor; she wants medical treatment. And the homeowner victimized by the phony meter reader does not want strangers in his house unless they have authorized service functions. The dealer's objection to the customer who claims falsely to have a lower price from a competing dealer is not to the physical presence of the customer, but to the fraud that he is trying to perpetuate. The lines are not bright--they are not even inevitable. They are the traces of the old forms of action, which have resulted in a multitude of artificial distinctions in modern law. But that is nothing new.
 
 
 21
 There was no invasion in the present case of any of the specific interests that the tort of trespass seeks to protect. The test patients entered offices that were open to anyone expressing a desire for ophthalmic services and videotaped physicians engaged in professional, not personal, communications with strangers (the testers themselves). The activities of the offices were not disrupted, as in People v. Segal, 78 Misc.2d 944, 358 N.Y.S.2d 866 (Crim.Ct.1974), another case of gaining entry by false pretenses. See also Le Mistral, Inc. v. Columbia Broadcasting System, supra, 402 N.Y.S.2d at 81 n. 1. Nor was there any "inva[sion of] a person's private space," Haynes v. Alfred A. Knopf, Inc., supra, 8 F.3d at 1229, as in our hypothetical meter-reader case, as in the famous case of De May v. Roberts, 46 Mich. 160, 9 N.W. 146 (1881) (where a doctor, called to the plaintiff's home to deliver her baby, brought along with him a friend who was curious to see a birth but was not a medical doctor, and represented the friend to be his medical assistant), as in one of its numerous modern counterparts, Miller v. National Broadcasting Co., 187 Cal.App.3d 1463, 232 Cal.Rptr. 668, 679 (1986), and as in Dietemann v. Time, Inc., 449 F.2d 245 (9th Cir.1971), on which the plaintiffs in our case rely. Dietemann involved a home. True, the portion invaded was an office, where the plaintiff performed quack healing of nonexistent ailments. The parallel to this case is plain enough, but there is a difference. Dietemann was not in business, and did not advertise his services or charge for them. His quackery was private.
 
 
 22
 No embarrassingly intimate details of anybody's life were publicized in the present case. There was no eavesdropping on a private conversation; the testers recorded their own conversations with the Desnick Eye Center's physicians. There was no violation of the doctor-patient privilege. There was no theft, or intent to steal, trade secrets; no disruption of decorum, of peace and quiet; no noisy or distracting demonstrations. Had the testers been undercover FBI agents, there would have been no violation of the Fourth Amendment, because there would have been no invasion of a legally protected interest in property or privacy. United States v. White, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971); Lewis v. United States, 385 U.S. 206, 211, 87 S.Ct. 424, 427-28, 17 L.Ed.2d 312 (1966); Forster v. County of Santa Barbara, 896 F.2d 1146, 1148-49 (9th Cir.1990); Northside Realty Associates, Inc. v. United States, 605 F.2d 1348, 1355 (5th Cir.1979). "Testers" who pose as prospective home buyers in order to gather evidence of housing discrimination are not trespassers even if they are private persons not acting under color of law. Cf. id. at 1355. The situation of the defendants' "testers" is analogous. Like testers seeking evidence of violation of anti-discrimination laws, the defendants' test patients gained entry into the plaintiffs' premises by misrepresenting their purposes (more precisely by a misleading omission to disclose those purposes). But the entry was not invasive in the sense of infringing the kind of interest of the plaintiffs that the law of trespass protects; it was not an interference with the ownership or possession of land. We need not consider what if any difference it would make if the plaintiffs had festooned the premises with signs forbidding the entry of testers or other snoops. Perhaps none, see United States v. Centennial Builders, Inc., 747 F.2d 678, 683 (11th Cir.1984), but that is an issue for another day.
 
 
 23
 What we have said largely disposes of two other claims--infringement of the right of privacy, and illegal wiretapping. The right of privacy embraces several distinct interests, but the only ones conceivably involved here are the closely related interests in concealing intimate personal facts and in preventing intrusion into legitimately private activities, such as phone conversations. Haynes v. Alfred A. Knopf, Inc., supra, 8 F.3d at 1229; Zinda v. Louisiana Pacific Corp., 149 Wis.2d 913, 440 N.W.2d 548, 555 (1989); Doe v. Methodist Hospital, 639 N.E.2d 683, 685 (Ind.App.1994). As we have said already, no intimate personal facts concerning the two individual plaintiffs (remember that Dr. Desnick himself is not a plaintiff) were revealed; and the only conversations that were recorded were conversations with the testers themselves. Thomas v. Pearl, 998 F.2d 447, 452 (7th Cir.1993).
 
 
 24
 The federal and state wiretapping statutes that the plaintiffs invoke allow one party to a conversation to record the conversation unless his purpose in doing so is to commit a crime or a tort or (in the case of the state, but not the federal, law) to do "other injurious acts." 18 U.S.C. Sec. 2511(2)(d); Wis.Stat. Sec. 968.31(2)(c); Thomas v. Pearl, supra, 998 F.2d at 451; State v. Waste Management of Wisconsin, Inc., 81 Wis.2d 555, 261 N.W.2d 147, 154 (1978). The defendants did not order the camera-armed testers into the Desnick Eye Center's premises in order to commit a crime or tort. Maybe the program as it was eventually broadcast was tortious, for we have said that the defamation count was dismissed prematurely. But there is no suggestion that the defendants sent the testers into the Wisconsin and Illinois offices for the purpose of defaming the plaintiffs by charging tampering with the glare machine. The purpose, by the plaintiffs' own account, was to see whether the Center's physicians would recommend cataract surgery on the testers. By the same token it was not to injure the Desnick Eye Center, unless the public exposure of misconduct is an "injurious act" within the meaning of the Wisconsin statute. Telling the world the truth about a Medicare fraud is hardly what the framers of the statute could have had in mind in forbidding a person to record his own conversations if he was trying to commit an "injurious act." See id., 261 N.W.2d at 154 and n. 17.
 
 
 25
 Last is the charge of fraud in the defendants' gaining entry to the Chicago office and being permitted while there to interview staff and film a cataract operation, and in their obtaining the Desnick Eye Center's informational videotape. The alleged fraud consists of a series of false promises by the defendants--that the broadcast segment would be fair and balanced and that the defendants would not use "ambush" interviews or undercover surveillance tactics in making the segment. Since the promises were given in exchange for Desnick's permission to do things calculated to enhance the value of the broadcast segment, they were, one might have thought, supported by consideration and thus a basis for a breach of contract suit. That we need not decide. The plaintiffs had a claim for breach of contract in their complaint and it survived the motion to dismiss, but they voluntarily dismissed the claim so that there would be a final judgment from which they could appeal. The only issue before us is fraud.
 
 
 26
 Unlike most states nowadays, Illinois does not provide a remedy for fraudulent promises ("promissory fraud")--unless they are part of a "scheme" to defraud. Willis v. Atkins, 412 Ill. 245, 106 N.E.2d 370, 377-78 (1952); Stamatakis Industries, Inc. v. King, 165 Ill.App.3d 879, 117 Ill.Dec. 419, 421-22, 520 N.E.2d 770, 772-73 (1987); Bower v. Jones, 978 F.2d 1004, 1011-12 (7th Cir.1992). The distinction between a mere promissory fraud and a scheme of promissory fraud is elusive, and has caused, to say the least, considerable uncertainty, as even the Illinois cases acknowledge. E.g., Stamatakis Industries, Inc. v. King, supra, 117 Ill.Dec. at 421-22, 520 N.E.2d at 772-73; Vance Pearson, Inc. v. Alexander, 86 Ill.App.3d 1105, 42 Ill.Dec. 204, 209, 408 N.E.2d 782, 787 (1980). Some cases suggest that the exception has swallowed the rule. Id., 42 Ill.Dec. at 209, 408 N.E.2d at 787; Lovejoy Electronics, Inc. v. O'Berto, 873 F.2d 1001, 1004 (7th Cir.1989); Price v. Highland Community Bank, 722 F.Supp. 454, 460 (N.D.Ill.1989). Others seem unwilling to apply the exception. For a good discussion, see Michael J. Polelle, "An Illinois Choice: Fossil Law or an Action for Promissory Fraud?" 32 DePaul L.Rev. 565, 578-88 (1983).
 
 
 27
 The distinction certainly is unsatisfactory, but it reflects an understandable ambivalence, albeit one shared by few other states, about allowing suits to be based on nothing more than an allegation of a fraudulent promise. There is a risk of turning every breach of contract suit into a fraud suit, of circumventing the limitation that the doctrine of consideration is supposed however ineptly to place on making all promises legally enforceable, and of thwarting the rule that denies the award of punitive damages for breach of contract. A great many promises belong to the realm of puffery, bragging, "mere words," and casual bonhomie, rather than to that of serious commitment. They are not intended to and ordinarily do not induce reliance; a healthy skepticism is a better protection against being fooled by them than the costly remedies of the law. In any event it is not our proper role as a federal court in a diversity suit to read "scheme" out of Illinois law; we must give it some meaning. Our best interpretation is that promissory fraud is actionable only if it either is particularly egregious or, what may amount to the same thing, it is embedded in a larger pattern of deceptions or enticements that reasonably induces reliance and against which the law ought to provide a remedy.
 
 
 28
 We cannot view the fraud alleged in this case in that light. Investigative journalists well known for ruthlessness promise to wear kid gloves. They break their promise, as any person of normal sophistication would expect. If that is "fraud," it is the kind against which potential victims can easily arm themselves by maintaining a minimum of skepticism about journalistic goals and methods. Desnick, needless to say, was no tyro, or child, or otherwise a member of a vulnerable group. He is a successful professional and entrepreneur. No legal remedies to protect him from what happened are required, or by Illinois provided. It would be different if the false promises were stations on the way to taking Desnick to the cleaners. An elaborate artifice of fraud is the central meaning of a scheme to defraud through false promises. The only scheme here was a scheme to expose publicly any bad practices that the investigative team discovered, and that is not a fraudulent scheme.
 
 
 29
 Anyway we cannot see how the plaintiffs could have been harmed by the false promises. We may assume that had the defendants been honest, Desnick would have refused to admit the ABC crew to the Chicago premises or given Entine the videotape. But none of the negative parts of the broadcast segment were supplied by the visit to the Chicago premises or came out of the informational videotape, and Desnick could not have prevented the ambush interview or the undercover surveillance. The so-called fraud was harmless.
 
 
 30
 One further point about the claims concerning the making of the program segment, as distinct from the content of the segment itself, needs to be made. The Supreme Court in the name of the First Amendment has hedged about defamation suits, even when not brought by public figures, with many safeguards designed to protect a vigorous market in ideas and opinions. Today's "tabloid" style investigative television reportage, conducted by networks desperate for viewers in an increasingly competitive television market (see Capital Cities/ABC, Inc. v. FCC, 29 F.3d 309 (7th Cir.1994)), constitutes--although it is often shrill, one-sided, and offensive, and sometimes defamatory--an important part of that market. It is entitled to all the safeguards with which the Supreme Court has surrounded liability for defamation. And it is entitled to them regardless of the name of the tort, see, e.g., Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988), and, we add, regardless of whether the tort suit is aimed at the content of the broadcast or the production of the broadcast. If the broadcast itself does not contain actionable defamation, and no established rights are invaded in the process of creating it (for the media have no general immunity from tort or contract liability, Cohen v. Cowles Media Co., 501 U.S. 663, 669-70, 111 S.Ct. 2513, 2518-19, 115 L.Ed.2d 586 (1991); Le Mistral, Inc. v. Columbia Broadcasting System, supra ), then the target has no legal remedy even if the investigatory tactics used by the network are surreptitious, confrontational, unscrupulous, and ungentlemanly. In this case, there may have been--it is too early to tell--an actionable defamation, and if so the plaintiffs have a remedy. But none of their established rights under either state law or the federal wiretapping law was infringed by the making, as opposed to the dissemination, of the broadcast segment of which they complain, with the possible and possibly abandoned exception of contract law.
 
 
 31
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.