(No. 32245.—

LOUISE WILLIS, Appellant, *vs.* ROBERT ATKINS *et al.,* Appellees.

*Opinion filed May 22, 1952.*

LeRoy G. Charles, and James G. Lemon, Jr., both of Chicago, for appellant.

Charles J. Monahan, of Chicago, for appellee Robert Atkins.

Mr. Justice Fulton delivered the opinion of the court:

The appellant, Louise Willis, filed her complaint in equity in the circuit court of Cook County on March 19, 1947, against the appellees, Robert Atkins and Susie Crawford Green. The complaint prayed that certain deeds creating a joint tenancy in real estate between appellant and Robert Atkins, herein referred to as the appellee, be set aside for fraud; that appellee be decreed to return to appellant certain money and personal property and that an accounting be had relative to a certain funeral business then conducted in the name of Atkins in which appellant claimed an interest. The complaint was later supplemented and amended. The defendant Susie Crawford Green did not appear or defend. Appellee Atkins by his answer and amended answer denied the fraud alleged in the complaint and set up as an affirmative defense that the property and funds had been transferred in consideration of an illegal promise of marriage made at a time when appellee was already married and known to be so by the appellant. His answer further alleged that the transfers were outright gifts without any conditions, terms or limitations, and that the appellant's action was barred by *laches*. The cause was referred to a master in chancery to take proofs and report findings. The master found that the appellee was guilty of the fraud charged in the complaint and recommended granting the relief prayed, except as to an accounting in the business. In that connection he found that the appellant had not established her claim by the greater weight of the

evidence. Written objections to the master's report were heard and overruled. The objections were then ordered to stand as exceptions for hearing before the court. After a hearing, the court sustained the exceptions to the master's report and dismissed the appellant's suit for want of equity so far as the claim of fraud in connection with the execution of the deeds was concerned. The chancellor did find, however, that the appellee owed the appellant $1200 for money borrowed, and decreed the return of that amount with interest.

The decision of the court was entered on June 1, 1951, and on June 7, 1951, the appellant died. Thereafter an order was entered substituting her executor and the devisees and legatees under her will as parties appellant without changing the title of the cause. Because a freehold is involved the case is brought directly to this court, seeking a reversal of the decree of the circuit court. Since the title of the cause remains the same, we shall, in this opinion, refer to the appellant in the singular just as though Louise Willis were still living.

Counsel for the appellant lists nine errors relied upon for reversal but all may fairly be said to be covered by one contention: that the findings and decree are against the law and the evidence. We shall therefore turn our attention to the facts adduced at the hearing before the master.

The evidence for the appellant showed that the real estate in question is improved by a three-story brick building located at 4233 South Prairie Avenue in the city of Chicago. At the time of the trial there were fifteen rooms in this building, five in the basement, four on the first floor, four on the second floor and two on the third floor. Appellant had conducted a rooming house in this property for a number of years.

Prior to October 25, 1935, appellant and her husband, Virgil Willis, had owned this property in joint tenancy and

had occupied it as their home. On the date last mentioned Virgil Willis died and appellant became the sole owner of the property. The appellee had been friendly with both Mr. and Mrs. Willis since the year 1932. He had been entertained in their home from time to time, including invitations to meals. At the time of Willis's death, appellee was employed by his brother who conducted a funeral home on Indiana Avenue in the city of Chicago. He was paid $12 per week for his services.

Shortly after the death of Willis, the appellee called at the home of the appellant and offered his assistance. He told her that she knew nothing of business and that he would handle her affairs for her. Appellant testified that she accepted appellee's proffered assistance; that she did counsel and advise with the appellee; that he paid her bills for her with money she furnished and cared for her affairs generally. During the fall and winter of 1935-1936, the appellee became very attentive to the appellant. He took her and her cousin, Rose Frazier, to church every Sunday and often escorted the appellant to clubs and other meetings. He visited the Willis home almost daily and took most of his meals there.

In the spring of 1936, according to Rose Frazier, who testified for the appellant, the appellee openly made love to the appellant in her presence. This included ardent displays of affection, such as hugging and kissing. Appellee, in his "enthusiasm," often carried the appellant about the house. He told appellant that she was a wonderful woman, deserving of the best in life, which he would provide for her when he became established and made his mark in the world. At this time he told her that he had nothing but that someday when he got some money they would be married. It was at this time that he first spoke of his ambition to have his own funeral business and he told Rose Frazier that he and the appellant were going to have a funeral business together. He explained to the witness that he was

telling her this so that she would know that he was not trying to take advantage of the appellant.

In June of 1936, appellee first made a definite proposal of marriage. Appellant said that she would not marry anyone until her husband was dead a year. The appellee said he could wait, but about a week later he again broached the subject. He reminded appellant that he had asked her the week before to marry him and told her that he wanted her promise. Appellant testified that she consented to marry him; whereupon appellee told her that he had a confession to make; that he and his wife were separated but that he would have to get his divorce. Appellant expressed her surprise and the appellee asked her if she would help him get a divorce. She said that she would have to see about it. Later, the appellant gave him $50 towards the expenses of getting his divorce. The record shows that he obtained his divorce in the State of Mississippi in November of 1937.

In the fall of 1936, appellee asked the appellant several times to "put his name on her property." He told her that he was going to be a "big shot;" that he would make money and that when they were married he would do big things for her when they had a business of their own. He also spoke of trading the property in on a suitable funeral home when one was available.

These propositions culminated in a conversation in early December of 1936, which occurred in the presence of Rose Frazier. Appellant and appellee were in the living room of appellant's home. The appellee had again asked the appellant to put his name on her property telling her that it would give him prestige in business. She said that he should wait until they were married and he said that he would get the property anyway when that happened. He said, "My divorce will be here pretty soon and I am going to marry you." At this point Rose Frazier came in. According to her testimony, the appellee stated: "I want mama to put my name on her property. We're going to

get married soon. That would give me prestige. I want to be a businessman. That would help me a lot." He further stated that he loved her; that he would treat her nice; that she would have a private car and a chauffeur; that he and his brother had been talking about establishing a business the other day; that she would have to do nothing but sit in the office and that if she had confidence in him she would do what he asked her to. Rose Frazier further testified that appellant at this point appealed to her for advice. Frazier told the appellant to wait; whereupon the appellant said, "We are going to be married soon. I just can't hardly resist him, I have so much confidence that I feel like doing everything he wants or asks."

According to the appellant, she then agreed to transfer the property. The appellee sent her to his lawyer where the deeds were prepared and executed on December 9, 1936. It is undisputed that appellee's sister, Susie Crawford Green, then Susie Crawford, was the intermediary grantee and the grantor in the deed setting up the joint tenancy between appellant and appellee.

After the transfer of the property the appellant continued to occupy it as before. The appellee came there almost daily and continued his protestations of love and repeatedly renewed his promises of marriage. The appellant served the appellee whatever meals he wanted without charge. The appellee entered a school to train as a mortician. The appellant gave him money towards his expenses. Appellant testified that she gave him money all the time. After the appellee's divorce in 1937, appellant often asked him to marry her but appellee demurred, saying he could not properly care for her until he finished his schooling and established a business. Sometime during the year 1939, the appellee began rooming in appellant's home as well as boarding there. For this he paid nothing. According to appellant his only contribution from 1935 to 1947 was the payment of a decorating bill amounting to $165 and the

payment of about half of a bill for repairs to gutters on the house which totaled about $400. For a short time during 1942 the appellee conducted an ambulance business from the Willis house where a business telephone was installed. In the same year the appellee completed his schooling and received his license as a mortician.

Appellant testified that in 1943 appellee suggested that they move the business to Forty-seventh Street. He told her that a building was available there and that he needed about $600 and asked her to put that amount into the business. Appellant asked, "Where do I come in?" He told her that she would be a "silent partner" in the business and that half of it was hers. She reminded him that he had not kept his promise to marry her. He told her that he would marry her when the business was established and going good. She let him have the $600. According to the appellant, she spoke of marriage often after that and the appellee repeatedly assured her that he would marry her when the business was going good and making money.

Appellant helped the appellee open his funeral business at 418 East Forty-seventh Street. According to her testimony she helped clean the premises and assisted in preparing them for occupancy. After the business became established her work included help with the preparation of the bodies as well as office work. According to Rose Frazier, the appellant was at the place of business every day and often carried lunch to the appellee. He continued to take at least one meal a day in the home of the appellant.

The appellant and Rose Frazier both testified that at about the time the business was to be opened appellee told the appellant that he had "struck a snag" and needed $600 to pay the first two months' rent in advance. At this time the appellant reminded the appellee that her money was running out. He told her that she was a silent partner; that half of the business was hers and stated that he already owed her $3000. He said to her, "You have been so nice,

I would be less than a man not to marry you." He saw
Rose Frazier out of appellant's presence and asked her to
intercede for him to get the additional $600. He told
Frazier that the business was going to be as much appel-
lant's as his; that they were going to get married and
that someday they would be sitting on top of the world.
Rose Frazier saw the appellant give the appellee the $600
for which he asked.

Thereafter appellant helped the appellee in the opera-
tion of the business. She was there from 3:00 o'clock in
the afternoon until 9:00 or 10:00 o'clock at night. He
told her, "This is your business as well as mine. I want
you to help me run the business." She gave him her piano
and some other equipment from her home to take to the
business place. The appellee continued to eat meals in the
appellant's home and came there daily until shortly before
her action was filed in the spring of 1947.

In January of 1947, the appellant heard that the appellee
was married. When she approached him about it he denied
it and stated that he was engaged to her. Reports of his
marriage persisted and appellant again questioned him early
in February of 1947. Appellee said, "When I buy the
license for anybody it will be you. When I marry it will
be you." At this time she again asked him to marry her
and he told her he was making arrangements. The undis-
puted evidence is, however, that the appellee married one
Mary Brown in January of 1947. On March 19, 1947,
the date the suit was filed, appellee came to appellant's
home, said he was hungry and asked her if she were not
going to fix him any dinner. Appellant then said, "You
are married. Go home and let your wife fix your meals."

One James Saunders testified to a conversation that he
had with the appellee after appellant had filed her suit.
The conversation took place in the funeral home into which
witness was invited by the appellee. Appellee first intro-
duced a woman present as his wife and then said, "Mama

has got me in a mess. All my business is tied up. I have to give an account. You know how things are. I didn't want to marry the woman at all. I wanted a younger woman. I promised I would marry her but after things went as they did I couldn't feel justified and I found this girl and married her." Neither appellee nor his wife denied this conversation. Saunders also testified that he had roomed at the Willis house in 1946; that the appellee was taking his meals there at the time and that he heard the appellant on several occasions ask the appellee when they were being married; that on one particular occasion in September or October of 1946 appellee said, "Oh, mama, don't worry about marrying, I promised you." Witness testified that appellant then said, "I hear you are infatuated over a girl. What about my property?" Appellee then said, "You can have your property back but it takes time. That is a little thing. Don't worry about it." Appellee testified but did not mention or deny any of Saunders's testimony. It is undisputed that appellee sent a real-estate man to inspect the property with a view of selling it just before the appellant filed her suit.

The appellee was the only witness who testified in his behalf. He denied substantially all of the appellant's testimony. He testified that he had never asked her to marry him; that there had never been any conversation whatever between them concerning marriage. He stated that shortly after her husband's death appellant came to him for help, stating that there was a $3000 mortgage against her property and that if he would take the place of her husband, help support her and pay off the mortgage she would put the property in joint tenancy so that it would belong to the survivor of them. He states that the next thing he knew she had completed the transaction. He denied that he furnished the attorney or that he knew anything about the transfer other than what she told him until it was completed.

Appellee further testified that he helped pay the monthly installments due on the mortgage; that he paid the decorating bill, as the appellant had testified, in the amount of $165, as well as the entire bill for repairs to the gutters, amounting to over $400, and about $300 in taxes. He also testified that he paid the fuel bills and the insurance on the building. He denied that the appellant had fed him without charge but claimed that he had helped buy groceries. Appellee admitted on cross-examination that he had no receipts for payments claimed to have been made by him and he also testified that he had no bank account during the years in question. He admitted that he gave no consideration whatever for the transfer of the property at the time it occurred. He denied that he had ever borrowed any money from the appellee to put into the business. He claimed that his brother had assisted him in financing that enterprise. He also denied ever having told the appellant that she had an interest in the business. He stated that the only money he had ever received from the appellant were two advancements, amounting to $50 each.

Appellant, testifying in rebuttal, denied appellee's testimony that she made the proposition for the transfer of the property in return for his help. She admitted that there was a mortgage against the property at the time of her husband's death, payable in installments of $25.31 per month, but she denied that the appellee paid off any part of it. She stated that she had completed paying the mortgage in 1949, which was two years after the suit in question was filed. She denied that she was financially embarrassed at the time of her husband's death, stating that she had about $7000 in cash, including the proceeds of three life insurance policies. She denied that appellant had helped furnish food or that he paid any of the taxes or fuel bills. As to his contention that he paid for insurance, she pointed out that that item was included in the monthly payments on the mortgage.

The appellant contends that the facts in evidence show that the appellee conceived and executed a fraudulent scheme to secure her money and property by false, deceitful and fraudulent words and conduct designed to gain her confidence and trust for the sole purpose of inducing her to part with her real estate and personal property; that fraud in the inducement renders the transfers of money and property void and that equity will afford relief. The appellee contends that the property was given to him without any conditions or limitations; that he paid for it by carrying out appellant's proposal and that, in any event, the appellant cannot recover, because, according to her own evidence, the transfer was in consideration of an illegal contract to marry, a situation in which equity will afford no relief.

We find nothing whatever in the evidence to support appellee's contention that the property was transferred to him as a gift. His answer alleges that the property was given to him, "without any conditions, terms or limitations." Nothing in appellee's testimony at the trial proves or even tends to prove this claim. Quite to the contrary, appellee testified that appellant transferred the property upon the condition that he help her pay off the mortgage and contribute to her support. It may also be said here that appellee's answer says nothing about the agreement or terms of transfer to which he testified at the trial. The answer pleads no consideration whatever for the conveyance furnished at the time it took place or at any later time.

The appellee's testimony is contradicted and discredited in too many particulars to lend credence to his story that appellant was the moving party in seeking a transfer of the property. In this regard, appellee's testimony stands alone and unsupported, while appellant's testimony that the conveyance was made at the request of the appellee upon representations that it would give him prestige and assist him in his business is corroborated by the testimony of

Rose Frazier and to some extent by the testimony of James Saunders. Little weight can be given to appellee's testimony setting forth his theory of defense, when he is contradicted in so many particulars by direct evidence. For example, appellee says that there never was any talk of marriage between him and appellant, yet both Rose Frazier and James Saunders testified that it was mentioned and discussed in their presence not only once but on many occasions. Appellee stated that he never borrowed any money from the appellant to assist in establishing the business, yet Rose Frazier testified that he approached her on one occasion to intercede for him and that she was present and saw the money counted out to him.

Not only is appellee's story shaken by direct testimony, it is weakened further when we consider the circumstances of the parties at the time of Willis's death and shortly thereafter. At that time appellee was working for his brother for $12 per week. He had a couple of vehicles which he rented out to his brother and other funeral directors from time to time, but, according to his own testimony, his total income was about $20 per week. So far as appears, appellee had no other income and no other property. He had no bank account whatever during any of the time in question here. Appellant did have a bank account. She owned the real estate in question and in addition had about $7000 in cash, which included the proceeds of some life insurance policies. Her property was subject to a mortgage of $3225 to the Home Owners Loan Corporation, payable in small monthly installments. She had between $2000 and $3000 of indebtedness in addition to the mortgage. This included an open furniture account. She operated a rooming house and had a regular income from that source. In view of the financial conditions of the respective parties it seems to us most unlikely that appellant could have sought or received any substantial aid from the appellee. The appellee's attempt to show that the trans-

fer of property was supported by an adequate consideration is not sustained by the evidence.

This still leaves for our consideration, however, the question whether or not, under the facts appearing, the appellant is entitled to the affirmative relief she seeks. Appellee contends that the property was transferred as part of an illegal contract to marry; that equity will lend no support to the enforcement of such an agreement but will leave the parties where they find themselves as to any transaction growing out of, or forming a part of, the illegal contract. In support of his position, appellee relies upon those cases which hold that an agreement to marry, made at a time when one of the parties is married and known to be so by the other, is void and unenforceable. *Paddock v. Robinson,* 63 Ill. 99; *McQuillen v. Evans,* 353 Ill. 239.

We believe the master was correct in holding that these cases are inapplicable to the situation here presented. This is not an action for breach of contract to marry, nor does the appellant seek specific performance of such an agreement. Appellant seeks relief here on the ground that the facts presented show that the appellee entered upon and executed a fraudulent scheme to secure her property; that the fraud was perpetrated by conduct as well as words; that as one incident of his scheme he spoke of marriage without any intention of keeping his promise, for the purpose of gaining appellant's confidence; that his breach of that agreement was only an incident in his fraudulent scheme; that his representations as to the establishment of a joint business for himself and the plaintiff, his conduct in securing his training and working toward that apparent end, his continued protestations of love and affection over a period of eleven years, and his words of praise and flattery were other artifices and stratagems used to secure her trust; that the property was transferred not as part of the agreement to marry, nor in consideration thereof, but because of the confidence reposed by appellant

in the appellee, which induced in her mind the belief that he would make a success of his life and establish their joint business, as he represented he would.

We believe that the evidence amply sustains appellant's contention. The property and money were transferred after the agreement to marry and formed no part of the actual consideration for that agreement. The evidence shows that at the time appellee first spoke of marriage he was separated from his wife and had already formulated plans to divorce her. He obtained his divorce in 1937 but his dealings with the appellant continued for a period of ten years thereafter during which time he continued his design to get what he could from the appellant by imposing upon her good nature and building her confidence in him. During all this time he posed as the appellant's faithful lover, transacted her business, paid her bills with money furnished by her, assisted her in securing financing for necessary repairs and lived in her home as a member of the family without paying board or room. During this entire period, while securing assistance of all kinds from the appellant, he portrayed for her by his conduct the picture of a man striving to secure his education, establish a business and obtain for him and for her the comforts and luxuries of life which he repeatedly told her she so richly deserved.

We believe that equity can and should afford relief in such a situation as that presented here. Precedent is not lacking. In *People* v. *Miller,* 278 Ill. 490, this court sustained the conviction of the defendant of the crime of operating a confidence game under facts similar to those now before us. We there observed that a false promise of marriage made without any intention of keeping it, used to gain the confidence of the other party and thereby secure his property, comes within the prohibition of the statute. The dealings of the parties in that case also covered a period of years, and devices in addition to promises of

marriage were used to secure the victim's confidence. In the case cited, the defendant claimed that she was merely guilty of a breach of contract to marry, but we pointed out that the breach of that contract was a mere incident of a general false and fraudulent scheme. The *Miller case* involved a criminal prosecution under the statute, not a complaint in equity, but had the complaining witness appealed to a court of equity we doubt not that relief would have been forthcoming. It would, indeed, be an anomaly in the law if, upon a given state of facts, one could be guilty of a criminal fraud and upon the same facts equity should deny relief to his victim by failing to decree a return of the property fraudulently obtained. Relief from fraud is one of the oldest recognized grounds for affording equitable relief. The case of *People* v. *Marek,* 326 Ill. 11, is another case in which defendant was found guilty under the confidence-game statute, where false promises of marriage played an important part in securing the trust of the complaining witness and inducing her to transfer her property, though, as here, there was other conduct which assisted in the perpetration of the fraud.

Appellee cites and relies upon those cases which hold that actionable fraud cannot be predicated upon the mere failure to perform a promise, though there was no intention to perform the promise when made. (*Gage* v. *Lewis,* 68 Ill. 604; *Murphy* v. *Murphy,* 189 Ill. 360; *Bielby* v. *Bielby,* 333 Ill. 478.) We are aware of these decisions and of the general rule but believe it has no application to a situation such as that presented here, where the fraud was perpetrated and the confidence gained not by mere promises but by a course of conduct covering a period of almost twelve years in which appellee, by pretending great interest in the appellant's welfare and devotion to her affairs, secured not only her property but a large measure of his support. During all those years, he came to appellant's home almost daily, ate his meals with her and handled her

business affairs. There is no proof in the record of actual cohabitation, but except for that the parties were conducting themselves on as intimate a basis as that usually found in the relationship of husband and wife. The appellee, by all of his conduct, and not by mere promises, falsely represented that he and the appellant were building together for a rosy future, while all the time he was interested only in what he could get from her. The testimony of James Saunders, which was not denied by appellee, when considered with all the other evidence in the case, clearly shows that appellee's conduct towards appellant was deliberately and consciously false and misleading. The perfidy of the appellee becomes most clear when, even after his marriage, he continues to visit the home of the appellant, denies his marital status and requests that the appellant prepare his meals.

In the case of *Roda* v. *Berko,* 401 Ill. 335, we held that while a promise to perform an act, even though accompanied by an intention not to perform, is not such a false representation as would constitute fraud, yet where the false promise or representation of future conduct is the scheme or devise used to accomplish the fraud and cheat another of his property, equity will right the wrong and restore the property. We believe the same principle applies in the case at bar so far as the various promises made by the appellee are concerned, but we again observe that there is much more in this record than mere breach of promise.

The contention that appellant's suit is barred by *laches* is untenable. She brought her action as soon as the deception of the appellee became apparent. The fact that the real estate in question had been transferred in 1936 is immaterial. Only in 1947 did the extent and nature of the scheme appellee had been operating for nearly twelve years come to light, for it was then, when he had successfully established his business, that he made it apparent that appellant did not fit into his future plans either for his

business or social life. Appellant's suit was timely, albeit she had to discover the full nature of appellee's deception in the face of deliberate falsehoods designed to quiet her suspicions.

We conclude, therefore, that the decree of the circuit court denying that appellant was entitled to the restoration of her real estate was erroneous and should be reversed; that the decree of said court was correct and should be affirmed in the respect that it awarded to appellant the sum of $1200 with interest for money obtained from her by the appellee. The order of this court will be that the cause be remanded to the circuit court of Cook County with directions to enter a decree favorable to the appellant in accordance with the views herein expressed, incorporating all the recommendations of the master in chancery, including the recommendation that the deeds in question be declared null and void and of no force and effect because of fraud in the execution thereof.

*Affirmed in part, and reversed in part*
*and remanded, with directions.*