NOTICE

Decision filed 04/02/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 200135-U

NO. 5-20-0135

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| HEARTLAND WOMEN'S HEALTHCARE, LTD., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Jefferson County. |
| | ) | |
| v. | ) | No. 14-L-7 |
| | ) | |
| LESLIE SIMONTON-SMITH, | ) | Honorable |
| | ) | Evan L. Owens, |
| Defendant-Appellee. | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justices Moore and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held:* The trial court did not err in granting summary judgment in favor of the defendant, Dr. Leslie Simonton-Smith, where there was no genuine issue of material fact as to whether Dr. Simonton-Smith made a false or negligent statement of material fact about her plan to retire from the practice of medicine during negotiations in which the plaintiff, Heartland Women's Healthcare, sought to purchase her medical practice.

¶ 2    The plaintiff, Heartland Women's Healthcare (Heartland), brought a two-count complaint against the defendant, Dr. Leslie Simonton-Smith, alleging that Dr. Simonton-Smith made negligent and intentional misrepresentations during negotiations in which Heartland sought to purchase her medical practice. The trial court granted summary judgment in favor of Dr. Simonton-Smith. On appeal, Heartland contends that the court

1

erred in granting summary judgment where there were genuine issues of material fact as to whether Dr. Simonton-Smith made a false or negligent statement of material fact and whether Heartland justifiably relied on that false statement. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     From 2001 through 2009, Dr. Simonton-Smith practiced obstetrics and gynecology with Dr. David Walters in Mt. Vernon, Illinois, under their corporation, Women's Health Associates of Southern Illinois, S.C. (Women's Health Associates). In 2008 or 2009, Heartland started its medical practice in Mt. Vernon. Sometime in the summer or fall of 2009, Heartland approached Dr. Walters about its desire to purchase Women's Health Associates and employ both Dr. Simonton-Smith and Dr. Walters for three years; there were various oral discussions between the parties about the acquisition of the practice and employing the doctors. Dr. Michael Schifano, president of Heartland, was the primary negotiator for Heartland.

¶ 5     On October 19, 2009, Dr. Simonton-Smith and Dr. Walters entered into a written agreement with Heartland; the agreement was effective from January 1, 2010, through December 31, 2012. The intent of the agreement was to purchase the practice as well as employ the two doctors. According to the agreement, Women's Health Associates would continue to operate until December 31, 2009, upon which time both Dr. Simonton-Smith and Dr. Walters would become employees of Heartland and would be required to work 26 weeks per year. Heartland agreed that it would employ certain individuals currently working for Women's Health Associates and provide medical and health insurance for both

2

Dr. Simonton-Smith and Dr. Walters. Dr. Schifano had his attorney review the agreement for accuracy and completeness before he signed it. The agreement did not include any restrictive covenant or noncompete provision for either Dr. Simonton-Smith or Dr. Walters. There was also nothing in the agreement about the doctors being required to retire after the expiration of the agreement. Heartland did not have a financial valuation completed to determine the value of Women's Health Associates before entering into the agreement. The payment for acquisition of the practice was structured over the three years of the agreement. The agreement set out compensation for both Dr. Simonton-Smith and Dr. Walters as employees of the practice.

¶ 6    Dr. Simonton-Smith worked for Heartland throughout the entire length of the agreement and continued after the expiration of the agreement until May 1, 2013. At such time, she left Heartland and went to work for Asbery & Associates, another Mt. Vernon obstetrics and gynecology practice.

¶ 7    On January 24, 2014, Heartland filed a six-count complaint against Dr. Simonton-Smith, alleging breach of the written agreement for her alleged failure to work the required number of weeks out of each year, breach of an oral agreement to retire at the expiration of the agreement, tortious interference with a contract by inducing employees to leave Heartland, tortious interference with a contract by inducing patients to leave Heartland, breach of fiduciary duty for using confidential patient information to solicit patients and induce them to leave Heartland, and unjust enrichment on the grounds that she would be granted a windfall if she continued to practice medicine at a Heartland competitor after receiving the salary paid to her as a Heartland employee. On June 26, 2015, Heartland

3

filed its first amended complaint, which was substantially similar to the initial complaint. On December 20, 2016, Heartland filed a second amended complaint, alleging breach of contract for Dr. Simonton-Smith's failure to retire at the expiration of the agreement, for going into direct competition with Heartland by working for a competitor, and for soliciting employees and patients to induce them to leave Heartland; breach of fiduciary duty for inducing employees and patients to leave Heartland; and unjust enrichment. On August 8, 2018, the trial court dismissed Heartland's second amended complaint and granted Heartland leave to file a third amended complaint.

¶ 8    On August 17, 2018, Heartland filed a third amended complaint, which removed the two counts alleging a breach of contract and the count alleging unjust enrichment. The complaint alleged that Dr. Simonton-Smith committed fraudulent misrepresentation by fraudulently inducing Heartland to employ her by promising to retire; negligent misrepresentation in that she was negligent with regard to her statements concerning her retirement plans, and those statements were made in reckless disregard of the truth. The complaint also alleged breach of the written agreement because Dr. Simonton-Smith continued to practice medicine after leaving Heartland. On December 3, 2018, Dr. Simonton-Smith filed a motion to dismiss and, after a hearing, the trial court dismissed the third amended complaint and granted Heartland leave to file a fourth amended complaint.

¶ 9    On December 7, 2018, Heartland filed its fourth amended complaint, which is the complaint at issue here. In this complaint, Heartland made allegations of fraudulent and negligent misrepresentation; this complaint eliminated the breach of contract allegation. As for the fraudulent misrepresentation claim, Heartland alleged that the objective for the

written agreement was for Heartland to purchase Women's Heath Associates and hire Dr. Simonton-Smith as an employee until her retirement; prior to signing the written agreement, Dr. Simonton-Smith told Dr. Schifano that she was retiring at the expiration of the agreement; and she subsequently failed to retire and instead directly competed with Heartland by working for a nearby healthcare provider. Heartland also alleged that the statements made by Dr. Simonton-Smith regarding her retirement plans were false statements of material fact; she knew the statements were false or were made in reckless disregard of the truth; she made these statements with the intent to induce Heartland to enter into the agreement and pay her in excess of $2 million, which was substantially higher compensation than what other similarly situated medical providers earned in Jefferson County; and Heartland reasonably believed Dr. Simonton-Smith's statements concerning her retirement plans and entered into the agreement in justifiable reliance on the truth of those statements. Heartland further asserted that it performed all of its obligations under the agreement. Heartland contended that as a result of Dr. Simonton-Smith's actions, it was prevented from completing its acquisition of the medical practice and was deprived of the benefits of the agreement, which included acquiring the goodwill of the practice. Regarding the negligent misrepresentation allegation, Heartland contended that Dr. Simonton-Smith was negligent regarding her statements about her retirement plans, and she made statements about her intention to retire without any regard to whether they were true or false.

¶ 10    On April 5, 2019, Dr. Simonton-Smith filed a motion for summary judgment, contending that the facts alleged by Heartland were not legally sufficient to constitute a

5

claim for either fraudulent or negligent misrepresentation. In the motion, Dr. Simonton-Smith contended, *inter alia*, that Heartland could not have reasonably relied on any alleged misrepresentation. She argued that Dr. Schifano's testimony at his August 27, 2014, discovery deposition evidenced Heartland's lack of reliance on any conversation about her retirement because he admitted that her retirement was not part of the bargain to purchase the practice and that during the time that she was a Heartland employee, another Heartland physician attempted to coax her into remaining employed there after the expiration of the agreement term. She also contended that Heartland could not show that she breached the written agreement, and even if Dr. Schifano believed that she was going to retire, he took no action to include language to that effect in the written agreement. She argued that any alleged oral agreement forcing her to retire would be unenforceable as an overly broad and restrictive noncompete agreement.

¶ 11 Dr. Simonton-Smith further argued the record showed, at best, that she expressed the fact that she considered the possibility of retirement and wondered about life postretirement, which was an opinion and not actionable as fraud. Even if her statements were construed as material fact, she argued that those statements were not statements of current or prior fact but were instead statements of intentions to perform an act in the future, which were also not actionable as fraud.

¶ 12 On May 10, 2019, the trial court entered an order by docket entry granting summary judgment in favor of Dr. Simonton-Smith. On May 30, 2019, Heartland filed a motion to reconsider the court's order. In the motion, Heartland contended that a false representation as to future conduct or intention that was the scheme or device utilized to perpetuate the

6

fraud was an exception to the general rule that statements concerning future conduct or intentions could not form the basis for a claim of negligent or fraudulent misrepresentation. Heartland asserted that because Dr. Simonton-Smith's misrepresentations were the device used to accomplish the fraud, it was immaterial that the misrepresentations consisted of statements referring to future conduct. Heartland pointed to Dr. Schifano's discovery deposition testimony to establish that Dr. Simonton-Smith promised him that she would retire at the expiration of the agreement and that there were issues of material fact as to whether she made misrepresentations regarding her eventual retirement. Heartland also asserted that Dr. Simonton-Smith's own actions defrauded it out of the purchase of the practice and from acquiring the goodwill because she contacted her patients regarding her change of employment. Heartland further contended that whether it justifiably relied on Dr. Simonton-Smith's misrepresentations was a question of fact for the jury.

¶ 13    On June 26, 2019, the trial court entered a written order granting summary judgment in favor of Dr. Simonton-Smith. In its order, the court noted that the written agreement was poorly drafted, its ineffectiveness was central to the dispute between the parties, and the expectations of the parties as expressed in the various pleadings were not set forth in the agreement in that it did not contain a noncompete clause and it did not contain any language setting out the requirement that Dr. Simonton-Smith was to retire at the agreement's expiration. The court found that Heartland could not allege any misrepresentation or fraud where the alleged acts of fraud did not happen at the time of the transaction or even when the contract was in effect. Instead, Heartland attempted to demonstrate that a misrepresentation or fraud occurred after the natural expiration of the

agreement. The court found that for misrepresentation or fraud to be actionable, "it cannot look backwards in time to declare as misrepresentation or fraud an act that was not such at the time of occurrence." The court noted that throughout Dr. Schifano's deposition testimony, he spoke of having an "assumption" that Dr. Simonton-Smith would retire when the agreement expired. However, contrary to his own "assumption," Dr. Schifano had Dr. Simonton-Smith continue to work for Heartland even after the agreement had expired, which proved that there was no actual representation and therefore no justifiable reliance upon any promise to retire. The court concluded that even if it could be said that the "meager discussions" constituted such a promise, which they did not, the term and scope of the promise to retire entirely from the practice of medicine would be so broad as to violate all principles applicable to restrictive covenants in the state of Illinois. The court found that, from the testimony presented, there was "no promise, no reliance, no misrepresentation, and no fraud."

¶ 14 On July 11, 2019, the trial court entered an order denying Heartland's motion to reconsider. The following day, Heartland filed a motion for a Rule 304(a) finding, so that it could seek an immediate appeal. Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016). On March 26, 2020, the court granted Heartland's motion and found that there was no just reason for delaying Heartland's appeal of the order granting summary judgment in favor of Dr. Simonton-Smith. Heartland subsequently filed its notice of appeal.

¶ 15                                      II. ANALYSIS

¶ 16 The sole issue on appeal is whether the trial court erred in granting summary judgment in favor of Dr. Simonton-Smith.

8

¶ 17    Summary judgment is proper when the pleadings, affidavits, depositions, and admissions of record show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Colvin v. Hobart Brothers*, 156 Ill. 2d 166, 169 (1993). This relief is an appropriate tool to employ in the expeditious disposition of a lawsuit, but it should only be allowed when the right of the moving party is clear and free from doubt. *Id*. at 169-70. When determining whether a genuine issue of material fact exists, courts construe the pleadings liberally in favor of the nonmoving party. *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 113 (1995). We review summary judgment rulings *de novo* (*id*.), and we will only disturb the decision of the trial court where we find that a genuine issue of material fact exists. *Addison v. Whittenberg*, 124 Ill. 2d 287, 294 (1988). A genuine issue of material fact exists where the facts are in dispute or where reasonable minds could draw different inferences from the undisputed facts. *Morrissey v. Arlington Park Racecourse, LLC*, 404 Ill. App. 3d 711, 724 (2010); see also *In re Estate of Ciesiolkiewicz*, 243 Ill. App. 3d 506, 510 (1993).

¶ 18    To state a claim for fraudulent misrepresentation, plaintiff must establish the following elements: (1) a false statement of material fact, (2) known or believed to be false by the person making it, (3) an intent to induce plaintiff to act, (4) action by plaintiff in justifiable reliance on the truth of the statement, and (5) damage to plaintiff resulting from such reliance. *Doe v. Dilling*, 228 Ill. 2d 324, 342-43 (2008). A misrepresentation is "material" where plaintiff would have acted differently had it been aware of the misrepresentation. *Fogel v. Enterprise Leasing Co. of Chicago*, 353 Ill. App. 3d 165, 171 (2004). Also, the reliance on the statement must have been justified, *i.e.*, the other party

9

had a right to rely on the statement. *Doe*, 228 Ill. 2d at 343. "Negligent misrepresentation has essentially the same elements, except that the defendant's mental state is different." *Board of Education v. A, C & S, Inc.*, 131 Ill. 2d 428, 452 (1989). For negligent misrepresentation, plaintiff need not prove defendant knew the statement was false but only that he was careless or negligent in ascertaining the truth of the statement. *Id*. A plaintiff must also allege that defendant owes a duty to plaintiff to communicate accurate information. *Id*.

¶ 19 Here, the written agreement between Heartland and Dr. Simonton-Smith did not contain any provision that required, or even contemplated, Dr. Simonton-Smith's retirement at the expiration of the agreement's three-year term.[1] In fact, Dr. Simonton-Smith remained an employee of Heartland after the expiration of the agreement's terms and had conversations with another Heartland physician in which interest was expressed in having her remain an employee thereafter. Also, in his discovery deposition, Dr. Schifano testified that his attorney reviewed the written agreement for accuracy and completeness before he signed it, he believed that it fully set out the parties' agreement when he signed it, Heartland's purchase of the medical practice was not dependent on the doctors' promising to retire, and there was no additional consideration given to make any oral promise concerning retirement enforceable.

---

[1]It is also important to note that there was no provision requiring Dr. Walters to retire at the expiration of the agreement, even though Dr. Schifano indicated that it was uncertain whether Dr. Walters would retire at that time.

10

¶ 20    Therefore, Heartland's claims of fraudulent and negligent misrepresentation are based on an alleged oral agreement with Dr. Simonton-Smith that she would retire at the expiration of the written agreement.  Heartland contends that Dr. Simonton-Smith entered into the written agreement knowing that her oral promise of retirement was false and that it justifiably relied on this promise when entering into the written agreement.

¶ 21    In response, Dr. Simonton-Smith contends that any statements made concerning her retirement during the course of negotiations were not promises to retire but instead statements of hope and opinion.  Also, she contends that any alleged promise to retire at the expiration of the agreement was a future promise, and under the general rule, would not be actionable as fraud.

¶ 22    The statement of material fact requirement for fraudulent and negligent misrepresentation is at issue in this appeal.  A false representation of a material fact must be one of an existing or past fact and not merely a promise to do some act in the future. *Polivka v. Worth Dairy, Inc.*, 26 Ill. App. 3d 961, 966 (1974).  The fraud must be complete at the time of the transaction and not be an intention to commit a fraud in the future.  *May v. Charles O. Larson Co.*, 304 Ill. App. 137, 145 (1940); see also *Tonchen v. All-Steel Equipment, Inc.*, 13 Ill. App. 3d 454, 464 (1973) (a fraudulent misrepresentation that induces a person to action must be based upon a present or a past fact and cannot rest upon a false promise to do something in the future, even though accompanied by an intention not to perform).  In *Metropolitan Sanitary District of Greater Chicago v. Anthony Pontarelli & Sons, Inc.*, the appellate court found that summary judgment was properly granted on the allegation that defendant-contractor falsely and fraudulently represented that

11

it would complete the construction of a sewer for plaintiff-sanitary district while having no intention of doing so. *Metropolitan Sanitary District of Greater Chicago v. Anthony Pontarelli & Sons, Inc.*, 7 Ill. App. 3d 829, 841-42 (1972). In making this decision, the court found that the contractor's action could not constitute fraud because the alleged misrepresentation related to something that was to be done in the future. *Id*.

¶ 23    There is an exception to the general rule that misrepresentations of intention to perform future conduct, even if made without a present intention to perform, do not constitute fraud. In cases where the false promise or representation of intention of future conduct is the scheme or device to accomplish the fraud, equity will right the wrong by restoring the parties to the positions they occupied before the fraud was committed. *Roda v. Berko*, 401 Ill. 335, 340 (1948). In *Roda*, the supreme court held that plaintiff's amended complaint properly alleged a scheme to defraud where it contained allegations that defendant desired to purchase her property for use of a junkyard but stated to plaintiff that he was buying it to build a factory upon, that plaintiff believed such statements to be true, and relying thereon, sold and conveyed to him the property. *Id*. at 340-41.

¶ 24    This exception was reiterated in *Gold v. Dubish*, 193 Ill. App. 3d 339 (1989). There, our court found that the *Roda* exception applied where the allegations in plaintiffs' complaint indicated that plaintiffs sought to buy a grocery business from defendants; defendants promised plaintiffs that the transaction would be completed but had no intention of keeping that promise; and defendants made the promise to induce plaintiffs to quit their jobs so that plaintiffs' bargaining position would be weakened, and defendants could then impose different contractual terms on them. *Id*. at 349-50. This court concluded that the

12

false promise or representation of future conduct, *i.e.*, the promise that the deal would be completed, was alleged to be the scheme employed to accomplish the fraud. *Id*. at 350.

¶ 25    Although Illinois courts have found the existence of a fraudulent scheme, the distinguishing features of a "scheme" remain unclear. *General Electric Credit Auto Lease, Inc. v. Jankuski*, 177 Ill. App. 3d 380, 384 (1988). In some respects, this exception appears to "engulf the general rule." *Id.* In cases where the courts have found a fraudulent scheme, defendant made some promise contrary to her contemporaneous intent to follow through on the promise in the future. See, *e.g.*, *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 169 (1989) (plaintiff asserted a fraudulent scheme where the complaint alleged that defendants had made " 'repeated and numerous knowingly' " false promises and representations of future payment to induce plaintiff to continue providing them with goods and services); *Steinberg v. Chicago Medical School*, 69 Ill. 2d 320, 332-34 (1977) (plaintiffs alleged a fraudulent scheme where they alleged that, with the intent to deceive and defraud plaintiffs, defendant stated in its medical school catalogs that it would use certain criteria to evaluate medical school applications); *Vance Pearson, Inc. v. Alexander*, 86 Ill. App. 3d 1105, 1112 (1980) (defendant agreed to install a scale for plaintiff by a certain date, but evidence showed the promise was made without intent to keep it); *Carter v. Mueller*, 120 Ill. App. 3d 314, 320 (1983) (landlord's assurance to tenant that everything would be taken care of prior to tenant taking possession, along with later false statement that everything was taken care of, constituted a fraudulent scheme). Thus, it is apparent that a fraudulent scheme requires something more than merely a broken promise. See *Price v. Highland Community Bank*, 722 F. Supp. 454, 459-60 (N.D. Ill.

13

1989) (a change of mind can be a breach of contract, but it is not fraud), *aff'd*, 932 F.2d 601 (7th Cir. 1991). At a minimum, the cases finding a fraudulent scheme indicate that a plaintiff must demonstrate that a fraudulent intent existed at or before the time that the promise was made.

¶ 26   We also note that some courts have not only emphasized the significance of the existence of fraudulent intent at the time of the dealing but also the presence of a pattern of repeated false promises or representations. In *Metropolitan Bank & Trust Co. v. Oliver*, a case involving a bank that claimed a course of fraudulent and deceptive conduct prevented it from recovering a debt, the appellate court characterized a scheme to defraud as a "carefully constructed plan of deceit." *Metropolitan Bank & Trust Co. v. Oliver*, 4 Ill. App. 3d 975, 978 (1972). Similarly, in *Speakers of Sport, Inc. v. ProServ, Inc.*, the United States Court of Appeals for the Seventh Circuit characterized a scheme to defraud as "one element of a pattern of fraudulent acts." *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 866 (7th Cir. 1999). "By requiring that the plaintiff show a pattern, by thus not letting him rest on proving a single promise, the law reduces the likelihood of a spurious suit; for a series of unfulfilled promises is better (though of course not conclusive) evidence of fraud than a single unfulfilled promise." *Id.*

¶ 27   This requirement of a pattern of repeated false promises was illustrated in *HPI Health Care Services, Inc*. There, our supreme court found that the allegations against two of the defendants fit within the *Roda* exception because they made "repeated and numerous knowingly" false promises and representations of future payment but also concluded that the complaint failed to provide any specific factual allegations in support of plaintiff's

14

claim that a third defendant participated in the fraudulent scheme. *HPI Health Care Services, Inc.*, 131 Ill. 2d at 169-70. In deciding this, the court noted that the only specific allegation regarding the third defendant was that this defendant "requested" that plaintiff provide goods and services, even though it knew that plaintiff would not be paid. *Id.* at 170. The court noted that this request occurred only once before the beginning of the fraudulent scheme and thus was not part of the alleged scheme. *Id.*

¶ 28 Also, in *Willis v. Atkins*, our supreme court found a scheme where a fraud had been perpetrated for many years by a defendant seeking to obtain a substantial interest in plaintiff's property and money. *Willis v. Atkins*, 412 Ill. 245, 259-60 (1952). In making this decision, the court noted the general rule regarding future promises did not apply where the fraud was perpetrated not by a mere promise but by a course of conduct covering a period of almost 12 years. *Id.* at 259; see also *Stamatakis Industries, Inc. v. King*, 165 Ill. App. 3d 879, 883 (1987) (protracted negotiations between the parties showed that a scheme was alleged).

¶ 29 In contrast, other courts have found a scheme was properly alleged based on one instance of a false promise being made without any intention of following through on the promise. In *Vance Pearson, Inc. v. Alexander*, the appellate court held that a scheme was properly alleged when defendant had done no more than make a promise without intending to perform it. *Vance Pearson, Inc. v. Alexander*, 86 Ill. App. 3d 1105, 1112 (1980). Similarly, the scheme in *Roda* was based on one fraudulent promise. *Roda*, 401 Ill. at 340-41. Thus, it is unclear under the case law whether a scheme requires repeated false promises in furtherance of the fraud or can be based on one instance of a false promise.

15

"[T]he precedents appear to turn upon a case-by-case weighing of the equities, rather than clearly-defined principles." *Hollymatic Corp. v. Holly Systems, Inc.*, 620 F. Supp. 1366, 1369 (N.D. Ill. 1985).

¶ 30   Applying these principles to the case before us, we conclude that the trial court did not err in granting summary judgment in favor of Dr. Simonton-Smith.  Heartland made the following assertions with regard to the fraudulent and negligent misrepresentation allegations in its fourth amended complaint: the objective for the agreement between Heartland and Dr. Simonton-Smith was for Heartland to purchase Women's Health Associates and hire Dr. Simonton-Smith as an employee until her retirement; prior to signing the written agreement, Dr. Simonton-Smith indicated that she was retiring from the practice of medicine at the expiration of the agreement; she subsequently failed to retire and instead went into direct competition with Heartland; Dr. Simonton-Smith's statements regarding her retirement plans were false statements of material fact; she knew the statements were false or were in reckless disregard of the truth (or she was negligent regarding her statements about her retirement plans); the statements were made with the intent to induce Heartland to enter into the written agreement and pay her in excess of $2 million during the term of the agreement; and Heartland reasonably believed Dr. Simonton-Smith's statements concerning her retirement plans and entered into the agreement in justifiable reliance on the truth of those statements.

¶ 31   In support of these allegations, Heartland points to Dr. Schifano's discovery deposition where he indicated that a noncompete clause was not included in the written agreement because he believed that Dr. Simonton-Smith was retiring.  Heartland further

points to the following colloquy that occurred during Dr. Schifano's deposition regarding

his conversations with Dr. Simonton-Smith about her retirement plan:

"Q. You have made reference in the complaint to there being an agreement for Dr. Smith to retire?
A. Yes.
Q. When was that agreement made?
A. Well, that was an oral agreement that started at the beginning of negotiations between Dr. Walters, herself, and myself.
Q. So were these comments that were discussions during negotiations?
A. Yes.
Q. The negotiations that led to the execution of Exhibit 1 [(the written agreement)]?
A. I believe so, yes.
Q. But the noncompete or retirement requirement was not part of Exhibit 1 in writing?
A. I haven't seen any, no.
Q. So that is a correct statement?
A. That's a correct statement.
Q. Did you provide any consideration to Dr. Smith for this oral agreement, as you have characterized it, to retire?
A. When you say consideration, are you talking about monetary consideration?
Q. Monetary and/or nonmonetary.
A. Yes.
Q. What was that?
A. Two and a half million dollars over three years to work 26 weeks a year.
Q. And that's what was paid to her under Exhibit 1?
A. Absolutely.
Q. So you've not provided any consideration except that paid through Exhibit 1 for this alleged agreement to retire?
A. Nothing written, no.
Q. When you say nothing written, have you or have you not paid Dr. Smith something to retire besides what she was paid through Exhibit 1?
A. So besides the two and a half million dollars, no, I do not believe there is any additional due.
Q. Were there any oral agreements that you believe exist with Dr. Walters that occurred before the October 19, 2009, employment agreement?
A. Yes, there was some oral discussions.  He was not as adamant about retiring or wanted to leave this future open.
Q. So he wanted to leave his future open?
A. Correct.

17

Q. Sitting here today, do you have any document to corroborate that Dr. Smith also did not want to leave her future open?

A. Do I have a document? No.

Q. Was there any other witness that you're aware of to any comment Dr. Smith made about wanting to keep her options open?

A. I believe those discussions were limited to Dr. Walters and Dr. Smith, so Dr. Walters would be the only other one that I would know; however, there's many practitioners in my practice who had spoke[n] with—for example, Dr. Covlin had spoke[n] with Dr. Smith on multiple times. As a matter of fact, it was us that approached her towards the termination of this agreement that said, you know, we think you'd do well to continue. Why don't you just kind of back [*sic*] a little bit instead of just giving it all up. You still have time and energy, and you've got patients who adore you. Why don't you stay? It was our discussions that said, you know, we could work out a separate type of oral agreement.

Q. And, in fact, she did stay for a while after the termination of the October 19, 2009, agreement, didn't she?

A. Yes, she did.

Q. And you did not have a supplemental written agreement of any kind for that period of time, did you?

A. I don't believe there was one, no.

Q. Doctor, isn't it true that you just assumed she would retire at the end of the October 19, 2009, agreement?

A. At what point in time?

Q. When you entered into it.

A. Absolutely. I assumed because she told me she would. I assumed she was telling me the truth.

Q. But isn't it true, Doctor, that it was not part of the employment agreement that she was required to retire at the end of the October 2009 agreement?

A. There's no document that—there's no stipulation in that document that states she has to retire, no.

Q. Nor did you tell her in any negotiations that she had to retire on December 31, 2012?

A. No. Like I said, on the contrary, we asked her not to retire and to spend perhaps another year with us or whatever.

* * *

Q. Isn't it true that before Exhibit 1 was signed, that you never said, Dr. Smith, you know you've got to retire at the end of this agreement?

A. I don't recall stating that, no.

Q. Or words to that effect?

A. Did we discuss—if you're asking me if we discussed whether she was going to retire, it's my belief that we had discussed that the whole purpose of this entire agreement was that her and Dr. Walters were serious about retiring in three

18

years and that Dr. Walters may or may not continue, but she was pretty set on saying, 'I'm done. I don't—I'm tired. I'm done.' So, yes, I do have words to that effect that she was going to retire. The whole document is, you know, who stores records? Who pays tail? It's all driven. The environment of the contract is for someone to retire.

Q. Did you tell Dr. Smith, I'm not signing this document unless you are agreeing to retire at the end of its term?

A. No, I did not.

Q. Did anyone on behalf of Heartland say, 'Unless you are agreeing to retire when this agreement expires, we're not signing?'

A. No.

Q. In other words, it was your assumption, wasn't it, Doctor?

A. I guess we're going to have to disagree on the word 'assumption.'

Q. Even after the expiration of Exhibit 1, you encouraged her not to retire, as I understand it?

A. That is correct. I do recall this, conversations between myself and my other partner wanted her to stay. We enjoyed having her there."

Also, Dr. Simonton-Smith, in her August 27, 2014, discovery deposition, indicated that she had discussions with Dr. Walters about slowing down and the possibility of retirement and what that looked like for her. However, she noted that there were no definite plans for retirement. As for her conversations with Dr. Schifano about retirement, she testified that during the oral discussions with Heartland about the purchase of the practice, she discussed that she wanted the option to retire. She testified as follows:

"Q. *** Now, when you met with Dr. Schifano, did you ever tell Dr. Schifano that you were going to retire at the end of the three-year period that's provided for in Exhibit 1?

A. I told him that, yes, I was considering retiring.

* * *

Q. *** Before Exhibit 1 was entered into, had you ever discussed retirement with Dr. Schifano?

A. I believe that I voiced my desire that I would possibly like to retire in the near future, yes.

19

Q. And you keep using the word 'possibly' when you say that. As we sit here today, do you recall using the word 'possibly' with Dr. Schifano, or did you just tell Dr. Schifano that it was your plan to retire in three years?

A. I don't recall the phrasing that I used."

The preceding excerpts of the record indicate that it was undisputed that Dr. Simonton-Smith had contemplated retirement and that she had discussed what retirement would look like with her colleague, Dr. Walters. The record also indicated that she had discussed retirement with Dr. Schifano, although they disagreed whether this was just a conversation where she expressed a desire to retire, which is not actionable as fraud, or a promise to retire, which could be actionable as fraud.

¶ 32 Assuming *arguendo* that Dr. Simonton-Smith made an oral promise to retire during negotiations of the written agreement, we note that Heartland's claim still fails as it has presented no evidentiary facts to support the allegation that she never intended to fulfill that promise from the start (or that she acted negligently). As we noted above, for a future promise to be a basis for fraud under the exception for a scheme, Dr. Simonton-Smith must have made some promise contrary to her contemporaneous intent to follow through on the promise in the future. There were no facts presented that this was something more than an alleged broken promise; there was no evidentiary support for the argument that she had an intent to defraud at the time she entered into the written agreement. Dr. Schifano's testimony that Dr. Simonton-Smith was "pretty set" on retiring does not support the allegation that she had no intention of retiring when she made any oral promise and entered into the written agreement. Also, Dr. Simonton-Smith's deposition testimony that she discussed her retirement plans with both Dr. Schifano and Dr. Walters does not indicate

20

that she made a promise to retire that was contrary to her actual intent at the time. In fact, the deposition testimony supports the conclusion that her intention at the time was that she was considering retirement.

¶ 33　Heartland must allege specific facts, not conclusory factual allegations, that showed Dr. Simonton-Smith said or did something more than failed to adhere to any promise to retire. "If the rule were otherwise, anyone with a breach of contract claim could open the door to tort damages by alleging that the promises broken were never intended to be performed. Presumably, it is this result that the Illinois rule seeks to avoid." *Hollymatic Corp.*, 620 F. Supp. at 1369. Therefore, although Heartland has alleged that Dr. Simonton-Smith made the promise to retire knowing that the promise was false, and while we acknowledge that we have to construe the pleadings liberally in favor of the nonmoving party, we conclude that there was no evidentiary basis to support that element for fraudulent or negligent misrepresentation. If plaintiff fails to establish an element of the cause of action, summary judgment for defendant is proper. *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 114 (1995). The nonmoving party need not prove his case at the summary judgment stage but must present some factual basis that would support his claim. *Rucker v. Rucker*, 2014 IL App (1st) 132834, ¶ 49; see also *Winnetka Bank v. Mandas*, 202 Ill. App. 3d 373, 387-88 (1990) (the nonmoving party has a duty to present a factual basis which would arguably entitle him to judgment in his favor based on the law).

¶ 34　Further, where a pattern of false promises is required for the existence of a scheme, we conclude that there was also no evidentiary basis to demonstrate that Dr. Simonton-Smith repeatedly made false promises to retire to induce Heartland to enter into the written

21

agreement to purchase her practice. Thus, we conclude that summary judgment was proper where there was no genuine issue of material fact as to whether Dr. Simonton-Smith knew any statement made about her retirement plans was false or was negligently made.

¶ 35    Moreover, to the extent that Heartland is attempting to enforce an alleged oral promise to retire here, we note that would essentially be an overly broad noncompete agreement, which would likely be unenforceable. See *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶¶ 16-17 (contracts in total and general restraint on trade are generally void as the restraint must be reasonable). Accordingly, we conclude that the trial court did not err in granting summary judgment in favor of Dr. Simonton-Smith.

¶ 36                                III. CONCLUSION

¶ 37    For the foregoing reasons, we affirm the judgment of the circuit court of Jefferson County.


¶ 38    Affirmed.